**In re Clifford Dale DIVINEY and Apryl Alyse Diviney, Debtors.**

**Clifford Dale DIVINEY and Apryl Alyse Diviney, Plaintiffs,**

**v.**

**NationsBANK OF TEXAS, Defendant.**

**Bankruptcy No. 96–04770–M.**
**Adversary No. 97–0040–M.**

United States Bankruptcy Court, N.D. Oklahoma.

Aug. 19, 1997.

---

**17.** 3 KEITH M. LUNDIN, CHAPTER 13 BANKRUPTCY 9–25   n. 116 (2d ed.1994) (emphasis added).

Mark A. Craige, Tulsa, OK, for Petitioner.

John B. Heatly, Oklahoma City, OK, for Defendant.

## MEMORANDUM OPINION AND ORDER

TERRENCE L. MICHAEL, Bankruptcy Judge.

THIS MATTER comes before the Court pursuant to the Complaint filed herein. Trial on the merits was held July 14, 1997. Plaintiffs Clifford Dale Diviney and Apryl Alyse Diviney ("Debtors") were present in Court and represented by their attorney, Mark A. Craige. Defendant NationsBank of Texas ("Bank") appeared by and through its attorney, John B. Heatly. Evidence in the form of testimony and documentary exhibits was received by the Court. In addition, the parties, in their Pre–Trial Order filed with the Court on or about July 2, 1997, made certain stipulations of fact. Thereafter, post-trial briefs were submitted to the Court on July 29, 1997, and the matter was taken under advisement. The following represents findings of fact and conclusions of law as required by Bankruptcy Rule 7052.

### Statement of Facts

This matter centers around the repossession of a 1988 Ford Tempo ("the Car") purchased by one of the Debtors, Apryl Alyse Diviney ("Ms. Diviney"), and financed by Bank. The story begins with the purchase of the vehicle on August 30, 1988. In addition to a small down payment, the remaining purchase price of $11,516.19 was financed by Bank under the terms of a retail installment contract. The contract provided for repayment of the debt over a sixty month period

with interest at the rate of 13.25% per annum. The first payment was due under the contract on October 14, 1988.

Shortly after the purchase of the Car, Debtors filed a Chapter 7 bankruptcy case in the United States Bankruptcy Court for the Northern District of Texas (the "First Case"). Based upon the record, the First Case appears to have been a rather uneventful Chapter 7 case. Bank was given notice of the First Case. In their statement of intentions, Debtors expressed their intent to retain the Car. An Order of Discharge was entered on March 23, 1989. The record does not reflect that any reaffirmation agreement was executed between Debtors and the Bank in the First Case; in any event, the Debtors retained possession of the Car during and after the First Case.

Debtors filed a second bankruptcy proceeding, once again in the United States Bankruptcy Court for the Northern District of Texas, on April 7, 1992 ("the Second Case"). The Second Case, a Chapter 13 case, was filed in an attempt to save Debtors' home. The attempt failed. As a result, the Second Case was dismissed upon motion of the Trustee on or about February 17, 1993. Debtors remained in possession of the Car during the pendency of the Second Case.

Less than a month after dismissal of the Second Case, Debtors filed a third bankruptcy case, once again in the United States Bankruptcy Court for the Northern District of Texas ("the Third Case"). It is the Third Case which is now pending before this Court. The Third Case was also a Chapter 13 bankruptcy case. Debtors scheduled the claim of Bank in the amount of $5,600.00 and valued the Car at $3,000.00. Bank filed a proof of claim in the Third Case in the amount of $5,798.00.[1] On April 13, 1993, Debtors filed their initial Chapter 13 plan. The initial plan valued the secured claim of Bank at $3,000.00. Thereafter, on May 18, 1993,

Debtors filed a document entitled "Debtor's Preliminary Chapter 13 Plan." The preliminary Chapter 13 plan proposed to amortize Bank's allowed secured claim of $3,000.00 over a thirty-six month period with interest at the rate of ten percent per annum. Finally, on April 8, 1994, Debtors filed a document entitled "Debtors' Final Chapter 13 Plan and Motion for Valuation" (the "Final Plan"). Pursuant to the terms of the Final Plan, Bank was again allowed a secured claim of $3,000.00, once again amortized over thirty-six months with interest at the rate often percent per annum. The Final Plan provided for no payment to unsecured creditors. In addition, the Final Plan contained a section entitled "Motion for Valuation," through which the Debtors sought to value the claims of the various secured creditors at the amount set forth in the Final Plan. The record reflects that no objections to the Final Plan or the Motion for Valuation were filed, and the Final Plan was confirmed by Order of the Court (the "Confirmation Order") entered June 14, 1994.

Bank was active in the Third Case prior to the entry of the Confirmation Order. On December 21, 1993, Pamela Bassell, an attorney in Ft. Worth, Texas, ("Bassell") entered her appearance on behalf of Bank. In addition, Bassell filed a motion for relief from the automatic stay, requesting that Bank be allowed to enforce its rights and remedies with respect to the Car. Hearing on the motion for relief was scheduled for January 11, 1994. As is the case with many motions for relief from the automatic stay, the parties negotiated a settlement. That settlement was embodied in a document entitled "Agreed Order Regarding the Automatic Stay" (the "Stay Order"). The Stay Order was prepared by Bassell, approved as to substance and form by the Debtors and the Chapter 13 Trustee, and entered by the Court on January 21, 1994. The Stay Order required Debtors to request that the Chapter 13 Trustee begin immediate payments to

---

1. Although the record is not clear, the large difference between the amount of the original debt ($11,516.19) and the claimed amount ($5,798.00) would indicate that the Debtors continued to make payments to Bank during the period between the filing of the First Case and the Third Case.

Bank. In the event Debtors failed to make a payment to the Chapter 13 Trustee, Debtors were to receive written notification of the default and have ten days to cure the same. The Stay Order required Debtors to maintain insurance on the Car. The Stay Order contained a "drop dead" provision, providing that in the event Debtors defaulted under any obligations contained in the Stay Order, Bank would be entitled to immediate relief from the automatic stay and could seek immediate possession of the Car. The Stay Order also provided that Bank held a perfected security interest in the Car, and could take "all actions necessary to maintain a perfected security interest in the [Car] throughout the pendency of this bankruptcy proceeding." Neither the Final Plan nor the Confirmation Order make any reference to the Stay Order.

According to the testimony of Ms. Diviney, the claim of Bank was paid in full with interest in January 1996. The records of the Chapter 13 Trustee in Texas establish that Bank was paid the principal sum of $3,000.00 plus interest on or before August 9, 1996. In any event, the record is clear that on or before August 9, 1996, the allowed secured claim of Bank pursuant to the Final Plan had been paid in full.

More than a year after confirmation, in October of 1995, the Chapter 13 Trustee filed a motion to dismiss the Third Case as a result of the failure of the Debtors to make the payments required under the Final Plan. Upon receipt of this motion to dismiss, Debtors contacted the Chapter 13 Trustee and signed a document entitled "Interlocutory Order." Under the terms of the interlocutory order, Debtors were to cure all arrearages under the Final Plan on or before June 14, 1996. The interlocutory order provided that:

> The Trustee herein is hereby instructed and directed to submit a proposed "Order Dismissing Case Pursuant to Interlocutory Order," file a Final Report, and to disburse the funds in her hands per 11 U.S.C.

§ 1326(a), in the event the debtor(s) misses one payment for which an explanation satisfactory to the Trustee, in the Trustee's sole discretion, is not given, or if the above stated condition(s), if any, is not strictly complied with.

Ms. Diviney testified that she signed the interlocutory order without reading the same in order to avoid dismissal of the Third Case.

On June 27, 1996, the Bankruptcy Court entered its "Order Dismissing Case Pursuant to Interlocutory Order" (the "Dismissal Order"). Apparently the Chapter 13 Trustee submitted this order to the Court as a result of Debtors being in arrears of their payments under the Final Plan. This order, although entered on June 27, 1996, was not served on any parties, including Debtors, until July 8, 1996.

Ms. Diviney testified that Debtors did not receive a copy of the Dismissal Order but, rather, learned of the dismissal when contacted by an unsecured creditor seeking payment of its claim. As soon as possible, Debtors then filed their motion to reinstate the case and transfer it to this Court.[2] The motion to reinstate, apparently pursuant to local court rule in the Northern District of Texas, provided all creditors twenty days from the date of service to resist the same, and also notified all creditors that a hearing on the motion to reinstate would be held at 2:00 p.m. on August 26, 1996. The certificate of service attached to the motion to reinstate indicates that the same was served upon all creditors and parties in interest, including Bank. In addition, the testimony of Ms. Diviney is uncontroverted that at least one representative of Bank acknowledged receipt of the motion to reinstate.

No objection was filed to the motion to reinstate. On August 26, 1996, the bankruptcy court in Texas held a hearing, and ordered the case reinstated. Mr. Diviney traveled from Tulsa to Dallas, Texas in order to attend the hearing. The order reinstating the case (the "Reinstatement Order") reads in its entirety as follows:

2. Debtors moved to Tulsa, Oklahoma in early 1996.

## ORDER APPROVING MOTION TO REINSTATE CASE

After appearing before the Court this date, it is ORDERED that the above referenced case be reinstated ORDERED that a change of venue is approved for transfer to Tulsa, Oklahoma, to the Clerk of the Bankruptcy Court. [signed]

Ms. Diviney testified that she received a copy of the Reinstatement Order on September 3, 1996 and, immediately thereafter, caused the same to be mailed to all creditors and parties in interest via First Class United States mail, postage prepaid. The certificate of service with respect to this order indicates that the same was served upon Bank to the correct post office box address, with an incorrect zip code.

It is at this point that the events begin which are at the heart of Debtors' claim. Ms. Diviney testified to the following facts. Although Bank attempted to attack the credibility of Ms. Diviney, her testimony was uncontroverted, and, as such, is accepted by the Court. Some time during the late night/early morning of September 7, 1996, the Car was repossessed, at the direction of Bank, by Reagan, Manley and Reagan ("RMR"), a repossession agency in Tulsa, Oklahoma. The Car was repossessed without a breach of the peace. Debtors discovered the Car was missing on the morning of September 7. Where once the Car had been, there remained only skid marks which extended from the Debtors' driveway into the street in front of their residence, and stretched for a length of approximately 175 yards. Debtors, believing their car to be stolen, notified the Tulsa Police Department.

■ On September 9, 1996, the first business day following the repossession of the Car, Debtors contacted Bank and were in-

formed that the Car had been repossessed by RMR on behalf of the Bank. Ms. Diviney spoke with Shelly Marshall ("Ms. Marshall"), an employee of Bank, regarding the repossession of the Car. Ms. Diviney informed Ms. Marshall that the Third Case had been reinstated and that, as a result, Bank was subject to the provisions of the automatic stay and was not entitled to repossess the Car. Ms. Diviney also demanded return of the Car at that time. Ms. Marshall acknowledged receipt of the motion to reinstate; however, she stated that she had not received a copy of the Reinstatement Order. Ms. Marshall then put Ms. Diviney on hold while she called the Clerk of the Bankruptcy Court in Texas to confirm that the Third Case had, in fact, been reinstated. Ms. Marshall returned to the line with Ms. Diviney, expressed that she had confirmed that the Third Case had been reinstated and indicated that Bank had "made a mistake" in repossessing the Car. Ms. Marshall further indicated that Bank would not return the Car to Debtors unless proof of insurance of the Car was provided to Bank.[3] In support of Bank's position, Ms. Marshall cited Ms. Diviney to Section 3 of the Stay Order, which required Debtors to maintain insurance on the Car throughout the pendency of the bankruptcy proceeding.

On September 12, 1996, Bank sent a letter to the Debtors informing them of the repossession of the Car. That letter contained the following provisions:

NationsBank of Texas, N.A., formerly known as NCNB Texas National Bank, assignee of the FDIC, as owner and holder of the above referenced note, is currently in possession of the collateral described above since you have defaulted under the terms of the Retail Installment Agreement Dated August 30, 1988 (The Contract). The records of the bank reflect that the total earned net balance required to satisfy

---

3. Although Bank disputes the version of events as recounted by Ms. Diviney, Bank chose to present no evidence to the Court regarding these events. The only explanation offered to the Court in this regard was that Ms. Marshall was unavailable. While such unavailability is regrettable, it does not relieve Bank of the burden of presenting evidence regarding these conversations if they wish to dispute Ms. Diviney's version of the same. This Court finds it difficult to believe that an institution such as Bank has no record of these events other than the memory of one of its employees.

your indebtedness under the Contract is $4706.61(+) Repossession Expenses of $340.00, which makes a total earned balance due of $5046.61.

Please take notice that any funds received subsequent to the date of this letter will be applied towards the total earned balance quoted above; furthermore, unless the foregoing amount is paid in full to the bank prior to the date hereinafter specified in this sentence in **CERTIFIED FUNDS**, the bank will exercise its rights under the Contract and sell such motor vehicle to the highest bidder, for cash, at a private sale after September 23, 1996. Please contact Andrea Corbett for additional information at 1—910–805–2200.

*Plaintiff's Exhibit 2.* Thereafter, on September 23, 1996, Ms. Diviney spoke to Andrea Corbett ("Ms. Corbett"). Ms. Corbett informed her that the problems relating to the bankruptcy proceeding and reinstatement of the case were not her responsibility, placed Ms. Diviney on hold for over 30 minutes, and never returned to the call.

The Court also heard the testimony of the other Debtor, Clifford Dale Diviney ("Mr. Diviney") regarding his conversations with Bank. Mr. Diviney testified that he had over twenty calls with Bank after repossession of the Car. He spoke to various representatives of Bank, including Ms. Marshall and Bill Johnson ("Mr. Johnson"). According to Mr. Diviney, Ms. Marshall advised him that this was no longer a bankruptcy matter. Mr. Diviney testified that he then spoke to Mr. Johnson. According to Mr. Diviney, Mr. Johnson stated that Bank would not return the Car to the Debtors unless the Bank was paid in excess of $4,000.00 and provided proof of insurance.

The only substantive testimony provided by the Bank with respect to these conversations was contained in the deposition of Mr. Johnson, which was read into the record at trial.[4] In the initial stages of his deposition, Mr. Johnson testified that he told Mr. Diviney that "basically all he had to do was provide proof of insurance and that we [Bank] would be more than happy to get his vehicle back to him." On cross-examination, Mr. Johnson admitted that Bank would not have returned the Car unless and until Debtors made arrangements to pay Bank the remaining balance it claimed was due to it.

■ The testimony of the Debtors and Mr. Johnson are in direct conflict on what the Debtors told Bank regarding the reinstatement of their case. Debtors testified that they informed Bank of the reinstatement of their case (and of the automatic stay) on numerous occasions. Mr. Johnson testified that to the best of his knowledge neither he, nor anyone else at Bank, was ever informed by the Debtors that the Third Case had been reinstated. The Court does not find Mr. Johnson's testimony to be credible. It is inconceivable that someone in Debtors' position could go to the effort of reinstating their Chapter 13 bankruptcy case (including traveling from Tulsa to Dallas to attend court proceedings), understanding that the reinstatement of the case protected them from the collection efforts of creditors, and, when that protection is violated, fail to inform the offending party. The Court also notes Mr. Johnson's contradiction of his own testimony. Initially, Mr. Johnson unequivocally testified that all the Debtors would have had to do was provide proof of insurance to Bank and the Car would have been returned. Upon cross-examination, Mr. Johnson admitted that Bank would not have returned the Car

---

4. Counsel for Debtors objected to the admissibility of the testimony of Mr. Johnson by deposition. At the Pre–Trial Conference, said objection was based upon said counsel's belief that Mr. Johnson should be required to appear at trial. At the Pre–Trial Conference, the Court overruled the objection. At the time of trial, counsel for Debtors renewed his objection and, in addition to stating his belief that Mr. Johnson should be required to appear, objected on the basis that the testimony by telephonic deposition violated the due process rights of the Debtors. The Court once again overruled the objection, noting that the deposition contained over 17 pages of cross-examination by counsel for the Debtors. In addition, upon review of the transcript of the deposition, the Court notes that the parties *stipulated* that the deposition could be taken by telephonic means. As a result, it is difficult for this Court to see any viable basis for the objection.

unless Debtors made some arrangements to pay to Bank the remaining balance which it claimed to be due.[5] Finally, Mr. Johnson claimed that Bank was relying on provisions contained in the Stay Order as it refused to return the Car. The Court finds it difficult to believe that Bank would rely upon orders entered in a case which it truly believed had been dismissed.

Following repossession of the Car, Debtors were given the opportunity to and did retrieve certain items of personal property from the Car. Said retrieval occurred without incident. The Car was later sold for the sum of $235.00.

After the Car was sold, an entity called Credit Converters contacted the Debtors via mail to demand payment of an additional $4,861.71 which Bank claimed to be owed it. Credit Converters operated to collect debts on Bank's behalf as its agent, and was paid on a percentage basis, based upon the amount recovered. The letter at issue was dated November 27, 1996. There was no evidence of any further collection activities by Bank.

■ With respect to the issue of the value of the Car, Debtors provided evidence in the form of repair bills and their opinion that the value of the Car was, at the time of repossession, $2,500.00. Bank offered no evidence as to the value of the Car. Accordingly, the Court, on the basis of the record before it, finds the value of the Car at the time of the repossession to be $2,500.00. In addition to the value of the vehicle, Debtors have testified that they were damaged as a result of the loss of the car. Mr. Diviney testified that, as a result of the repossession of the car, his employment as a pizza delivery person was interrupted for a period of two weeks. Mr. Diviney testified that he averaged thirty hours per week and that his wages were $5.25 per hour for a total of $157.50 per week, or $315.00 in wages for a two week period. Mr. Diviney also testified that he also would receive tips as a pizza delivery person. Ms. Diviney testified that she lost an academic scholarship to a local college as a result of the repossession of the Car. In addition to the loss of the Car, the loss of the wages, and the lost scholarship, Debtors also claim damages for emotional distress. Debtors did not present any evidence of physical injury or expenses incurred as a result of said alleged emotional distress.

## Jurisdiction

■ Debtors allege violation of the automatic stay of 11 U.S.C. § 362(a) (West 1997)[6], and seek damages under 11 U.S.C. § 362(h). Those issues arise under title 11, and are within the Court's jurisdiction under 28 U.S.C. § 157(b)(1), (2)(A), (E) and (G). Debtors also raise issues based on state law. Those issues are at least related to this bankruptcy case, and are within the Court's jurisdiction under 28 U.S.C. § 1334(b), though they may be non-core proceedings under 28 U.S.C. § 157(b)(3) and (c)(1). For reasons set forth below, the Court does not reach those state-law issues.

## Analysis

The parties have raised the following issues for determination by the Court:

(1) Whether Bank, at the time of repossession, held any security interest in the Car;

(2) Whether Debtors are entitled to injunctive relief barring Bank from any further collection efforts with respect to the indebtedness represented by the Note;

(3) Whether damages should be assessed against Bank pursuant to 11 U.S.C. § 362(h); and

---

5. The Court notes that any deficiency which Bank may claim was discharged in the First Case and that Bank is in effect enjoined from seeking to collect these sums pursuant to 11 U.S.C. § 524(a). For purposes of the record, the Court wishes to make it clear that the decision made herein is based upon the violation of the automatic stay provisions of 11 U.S.C. § 362, and no other section.

6. Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et. seq.* (West 1997).

(4) Whether this Court should enter a judgment against Bank for conversion under the laws of the State of Oklahoma.

With respect to each issue, the Bank has raised certain defenses. Those which are relevant are discussed below.

## I.  Bank's Security Interest in the Car

Debtors argue that Bank, at the time of repossession, had no security interest in the Car, because Bank's former security interest terminated by operation of law when Bank's secured claim under § 506(a) was paid as provided for in the Final Plan. In response, Bank argues that its lien is not released and is not terminated by operation of law until the plan is completed and Debtors are discharged. Both parties' arguments have some merit; the issue is a difficult one. In this case, the Court deems it unnecessary to exhaust this issue. For present purposes, the Court assumes *arguendo* that Bank retains its lien.

## II.  Prospective Injunctive Relief

This issue has been resolved. At the July 2, 1997, Pretrial Conference, counsel for the Bank, upon inquiry by the Court, stated that Bank was not undertaking any additional collection efforts against Debtors. Counsel for the Debtors agreed that no collection efforts had taken place since November of 1996, as noted above. In any event, the Court notes that the indebtedness owed by Debtors to Bank was discharged in the First Case, and that collection of the same is also enjoined by the provisions of §§ 362 and 1327 in this case. No further injunctive relief is necessary at this time. Should Bank choose to violate any of these statutory provisions in the future, a remedy may be sought at that time.

## III.  Damages under § 362(h)

Violation of the automatic stay is the central issue raised in this adversary proceeding. In order to make a determination, the Court must determine the following:

(1) Whether Bank violated the provisions of § 362;

(2) Whether any such violation was willful; and

(3) The proper measure of damages for any violation.

For the reasons set forth below, the Court answers the first two questions in the affirmative, and awards damages to the Debtors.

### A.  Burden of Proof

As Bank points out in its Closing Brief, Debtors must prove the violation of the automatic stay by "clear and convincing evidence." *In re Bennett*, 135 B.R. 72, 76 (Bankr.S.D.Ohio 1992). The following definition of what constitutes "clear and convincing evidence" is found in the Modern Federal Jury Instructions:

> Clear and convincing evidence leaves no substantial doubt in your mind. It is proof that establishes in your mind, not only [that] the proposition at issue is probable, but also that it is highly probable. It is enough if the party with the burden of proof establishes his claim beyond any "substantial doubt"; he does not have to dispel every "reasonable doubt."

4 L. Sand, *et.al.*, *Modern Federal Jury Instructions* ¶ 73.01 at p. 73–16 (1997). The "clear and convincing" standard of proof is an intermediate standard between the "preponderance of the evidence" standard used in most civil cases, and the "beyond a reasonable doubt" standard used in criminal matters. *Addington v. Texas*, 441 U.S. 418, 423–24, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323, 329 (1979). The Court has applied this standard in making its decision.

### B.  Violation of the Automatic Stay

The Court believes that the provisions of § 362(a)(3) and (4) apply here. Those subsections are clear and unequivocal, and provide that the filing of a bankruptcy case "operates as a stay, applicable to *all* entities", of:

(3) any act to obtain possession of property of the estate or of property from

the estate or to exercise control over property of the estate; [and]

(4) any act to create, perfect or enforce any lien against property of the estate.

§ 362(a)(3), (4)(emphasis added). This statute expressly provides that the stay may be violated by an act to enforce a lien. This is why the Court need not decide whether Bank still has a lien. Even if Bank has a lien, Bank may violate the automatic stay by improper efforts to enforce such lien.

As it enacted § 362, Congress expressly recognized that the protection afforded debtors by the automatic stay is essential to the bankruptcy process.

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 340–342 (1977); S.Rep. No. 989, 95th Cong.2d Sess. 54–55 (1978); *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787 at 5840 and 6296–97. In a chapter 13 bankruptcy case, the automatic stay remains in effect until the case is dismissed or a discharge is granted or denied, unless the court has granted a creditor relief from the provisions of the automatic stay. § 362(c)(2), (d).

In order to determine whether the automatic stay has been violated by the Bank in this case, the Court must answer the following questions: (1) was the Third Case pending at the time of the acts in question; (2) was the Car property of the estate; (3) was repossession and sale of the Car an act to obtain possession of property of the estate or to enforce a lien against property of the estate; and (4) was the automatic stay in effect at the time of the repossession and sale of the Car. On the record before the Court, each of these questions must be answered in the affirmative.

■ The acts in question occurred between September 7, 1996 (repossession of the Car) and November 27, 1996 (the letter from Credit Converters seeking to collect the remaining "deficiency"). On August 27, 1996, eleven days before the first act in question, the United States Bankruptcy Court for the Northern District of Texas entered the Reinstatement Order. As a result of the Reinstatement Order, the Third Case was revived, and became an active case on the docket of the Texas court (and on the docket of this Court upon its transfer). The Third Case was clearly pending at the time the Car was repossessed and sold.

■ Bank has argued that the Reinstatement Order did not vacate the Dismissal Order. *Defendant's Closing Brief* at 10. This argument is without merit. First of all, Bank offers no explanation of what other effect reinstatement of the case could have. Although couched as a motion to reinstate, the motion can only be considered a motion to vacate the Dismissal Order. Such a motion is proper under Bankruptcy Rule 9024. *See* 10 L. King *et. al., Collier on Bankruptcy,* ¶ 9024.05 at 9024–6 (15th ed. rev.1997). Bankruptcy courts have reinstated dismissed Chapter 13 cases under this rule. *See In re Pearson,* 70 B.R. 202 (Bankr.S.D.Fla.1986). If the Reinstatement Order does not vacate the Dismissal Order, there is no case to reinstate, nor is there a case to transfer to this Court. To accept Bank's argument is to render the Reinstatement Order a legal nullity. This Court will not do so. The Court also notes that in defending its conduct, Bank has relied on the terms and provisions of the Agreed Order, which, according to Bank, miraculously survived the dismissal of the Third Case while all other orders perished. *See Defendant's Closing Brief* at 14. Certainly, if the terms of the Final Plan and Confirmation Order died with the Dismissal Order, the Agreed Order must have died as well. Bank's own conduct establishes its belief that the Third Case was pending at the time the Car was repossessed and sold.

■ Bank also argues that the Reinstatement Order did not reinstate the terms and

conditions of the Final Plan, nor did it cause the terms of § 362 to apply to the creditors in this case, including Bank. Bank cites no authority for its position. The argument defies logic. If reinstatement of the case does not result in parties being governed by the terms and provisions of the confirmed plan, it is of no use. It cannot be disputed that in a Chapter 13 case, the automatic stay remains in effect during the pendency of a case and until a discharge is granted or denied. § 362(c)(2). In this case, the automatic stay was reinstated on August 26, 1996, with the entry of the Reinstatement Order by Judge Abramson.

The Car was property of the Debtors' bankruptcy estate at the time of repossession. The Court does not believe this fact is in serious dispute. At all times from the inception of the First Case until its repossession, the Car was in the care, custody and control of the Debtors, and was used by both of them. At the time of the repossession and sale, title to the Car was in the name of Ms. Diviney. Similarly, there can be no dispute that the acts taken by the Bank, namely, repossession and sale of the Car, constituted acts to obtain possession of property of the estate and to enforce Bank's claimed lien against property of the estate.

■■■■ Bank argues that Mr. Diviney is not a proper party to this proceeding since his name does not appear on the title to the Car. Debtors respond that Mr. Diviney had a possessory or equitable interest in the Car, which he drove as a necessary part of his employment. The evidence regarding Mr. Diviney's use of the Car is not disputed. The Court finds that Mr. Diviney was harmed as a result of the repossession of the Car, and, as such, has standing to bring this action with his wife. *See Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556, 569 (1984) ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."). Section 362(h) of the Bankruptcy Code cares nothing for technicalities of title; it cares only whether an individual debtor was injured by willful violation of the stay. If Mr. Diviney can show he was injured by the Bank, he is to be awarded damages for his injuries.

■■■■ The final issue in this inquiry, whether the automatic stay was in effect at the time of the repossession and sale of the Car, is the subject of dispute. Debtors claim that the automatic stay was in effect as a result of reinstatement of their case. Bank claims that its conduct was authorized under the terms of the Stay Order, which was entered prior to the Confirmation Order. Bank asks the Court to find that its conduct was in accordance with the terms of the Stay Order as a result of various and sundry defaults by the Debtors, and as such, was proper. The Court need not reach that question. At the time of the acts in question, the Final Plan, and *not* the Stay Order, governed the rights of the parties.

■■■■ Section 1327(a) of the Bankruptcy Code provides as follows:

> The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan.

§ 1327(a). Courts have been quick to rule that the section means what it says.

> Section 1327 is clear. The provisions of a confirmed plan bind each creditor whether or not such creditor has objected to, has accepted, or has rejected the plan. The plans in the present cases provided for the curing of defaults and for the maintenance of payments to the appellants throughout the life of the plan. An order confirming a Chapter 13 plan is res judicata as to all justiciable issues which were or could have been decided at the confirmation hearing. [citation omitted] Section 1327 precludes a creditor from asserting, after confirmation, any other interest than that provided for it in the confirmed plan. The issues of adequate protection, lack of equity, and neces-

sity for a successful rehabilitation of the Chapter 13 debtor were all res judicata as of the confirmation of the plan. [citation omitted]

*In re Evans,* 30 B.R. 530, 531 (9th Cir. BAP 1983); *accord, In re Minzler,* 158 B.R. 720, 721 (Bankr.S.D.Ohio 1993). Under § 1327, all pre-petition agreements, unless expressly preserved in the plan and/or the order confirming the plan, are superseded by the terms and provisions of the plan. *In re Garrett,* 185 B.R. 620, 623 (Bankr.N.D.Ala. 1995). The plan becomes the operative document governing the rights, remedies and obligations of debtor and creditors, and supersedes all orders entered in the case not expressly preserved. The practical reason for such a rule is clear. At the end of the day, after the plan in any Chapter 13 case has been confirmed, the arrangements between debtors and their creditors need to be located in one place. If, in order to understand the arrangements between debtor and creditors, one is required to sort through the entire case file, the system becomes unworkable.

In the present case, the Final Plan provides that the Bank shall have an allowed secured claim in the amount of $3,000.00, which shall be paid over a period of not more than 36 months with interest at the rate of ten percent per annum. Neither the Final Plan nor the Confirmation Order make any mention of the Stay Order, nor are any of the provisions contained in the Stay Order upon which Bank now relies recited in the Final Plan or the Confirmation Order by reference or otherwise. Had the parties desired that any of the provisions contained in the Stay Order survive confirmation, it would have been a very simple matter to incorporate those provisions into the Final Plan and/or the Confirmation Order, either by insertion or reference. Bank (assumably with the ad-

vice of the same counsel who so artfully drafted the order) did not seek to do so. As a result, those provisions did not survive confirmation. Bank may not rely upon them.

█ Bank has been paid the full amount of its allowed secured claim, plus interest (Plaintiff's Exhibit 23). Under the Final Plan, Bank was to be paid zero with respect to the balance of its claim.[7] Bank has been paid all funds to which it is entitled, and has no right to any additional sums from Debtors.

█ Bank spends much time in its Closing Brief arguing that it did not have sufficient notice of the reinstatement of the Third Case. First of all, Bank argues that there is not sufficient evidence for the Court to conclude that Bank received a copy of the Reinstatement Order. Bank argues that the Reinstatement Order was addressed with an incorrect zip code and, as such, no presumption of receipt exists in this case. This argument ignores the uncontroverted evidence in the record that Bank received a copy of the motion to reinstate the Third Case, which was sent to the exact same (incorrect) address as the Reinstatement Order.[8] Since the motion to reinstate was admittedly received, it stands to reason that the Reinstatement Order was also received, especially in light of the lack of contradictory testimony.

█ Bank also attempts to make much of the fact that the copy of the Reinstatement Order which was received into evidence was a certified copy, and was certified *after* September 3, 1996, the date Ms. Diviney claims to have sent a copy of the Reinstatement Order to all parties listed on the certificate of service. The Court finds the argument unpersuasive. Upon both direct and cross examination, Ms. Diviney testified that she sent a copy of the Reinstatement Order to all

---

**7.** This is consistent with the discharge of Bank's claim in the First Case.

**8.** Plaintiffs' Exhibit 13, admitted without objection, was chronology of events prepared by Ms. Diviney. In that chronology, Ms. Diviney noted that Shelly Marshall acknowledged receipt of the

motion to reinstate the Third Case. The proofs of service attached to the motion to reinstate and the order reinstating the Third Case (Plaintiff's Exhibits 22 and 25) show that both the motion to reinstate and Reinstatement Order were sent to the same address.

listed entities on the certificate of service on September 3, 1996. When asked about the certification, Ms. Diviney did not know why the exhibit was certified, but remained steadfast in her testimony that the Reinstatement Order was sent on that date. The Court believes her. In addition, the Court notes that the Reinstatement Order was in effect a joint exhibit (Plaintiff's Exhibit 24 and Defendant's Exhibit 21), and that it was the copy *prepared by Bank* that was received into evidence. The fact that this copy was a certified copy does not prove that Ms. Diviney did not send the Reinstatement Order to Bank.

■ Bank also argues that the mailing of the order reinstating the Third Case was insufficient because it was not sent to Bassell. While perhaps much of what is before the Court today could have been avoided if Bank had received sound advice from counsel, the fact remains that Bank had actual notice of the reinstatement of the Third Case. The record also shows that since March of 1996, Ms. Diviney had been in direct contact with Ms. Marshall on behalf of Bank; indeed, Ms. Diviney testified that she was instructed by Bank to deal with them directly. The fact that Bassell was not sent a copy of the order reinstating the Third Case does not exonerate Bank.

In addition, Bank had actual notice of reinstatement of the case and of Debtors' position that the automatic stay was once again in effect prior to the sale of the Car. Both Mr. and Mrs. Diviney testified that they told representatives of the Bank on several occasions that the Third Case had been reinstated, that the repossession of the Car was wrongful, and that the Car must be returned to them. The Court accepts this testimony. In addition, there is evidence that the Bank, upon being so informed by Debtors, contacted the clerk of the bankruptcy court in Texas

and independently confirmed that the Third Case had been reinstated. Bank's evidence to the contrary, the testimony of Mr. Johnson, is neither substantial nor credible. Armed with the knowledge of and on notice that the Third Case was in full force and effect, Bank chose to sell the Car. It did so at its peril.

■ Finally, all of the arguments regarding the mailing of the order reinstating the Third Case become largely irrelevant in light of the actual notice which the Bank received. Both Debtors informed Bank that the Third Case had been reinstated; Bank then confirmed the fact for itself. The Court disagrees with the Bank's characterization of the notice which it received as "ambiguous." The statements made by Debtors to Bank were not ambiguous; they were loud, long and sometimes profane.[9] Given those circumstances, it is impossible for this Court to find that Bank did not have notice that the Third Case had been reinstated prior to the sale of the Car.

## C. Willfulness

■ Having determined that the conduct of the Bank violated the automatic stay, the Court must next determine whether the conduct of the Bank was willful. The Tenth Circuit has provided this Court with the following definition of willful conduct:

> The "willful" element is straightforward. It simply addresses whether the debtor intentionally performed the basic act complained of. [citation omitted] "Willful" conduct is conduct that is volitional and deliberate and over which the debtor exercises meaningful control, as opposed to unintentional or accidental conduct. [citation omitted] Thus, acts caused by the debtor's negligence or recklessness are not encompassed by this exception.

9. Bank's reliance on *In re Wrobel*, 197 B.R. 289 (Bankr.N.D.Ill.1996) is misplaced. In *Wrobel*, the debtor presented no evidence that she informed anyone of the filing of her Chapter 13 case; she merely testified that she had "filed a Chapter 13 in an attempt to save her home." *Id.* at 295, note 5. The court specifically found that the debtor in *Wrobel* presented no evidence that she or her attorneys had informed anyone involved, whether orally or in writing, of her pending Chapter 13. *Id.* Such is not the case here.

*In re Posta*, 866 F.2d 364, 367 (10th Cir. 1989). *Posta* dealt with the issue of a debtor's "willful and malicious injury" to property of another under § 523(a)(6). The Tenth Circuit has not issued a definition of "willful" as it applies to actions of creditors in violations of the automatic stay; the *Posta* definition is applicable here, and is in accordance with the rulings in other circuits regarding the definition of "willful" as it applies to a violation of the automatic stay.

A "willful violation" does not require a specific intent to violate the automatic stay. Rather, the statute provides for damages upon a finding that the defendant knew of the automatic stay and that the defendant's actions which violated the automatic stay were intentional. Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was "willful" or whether compensation must be awarded.

*In re Bloom*, 875 F.2d 224, 227 (9th Cir. 1989), *cited with approval in Taborski v. U.S. I.R.S.*, 141 B.R. 959, 966 (N.D.Ill.1992). Furthermore, ignorance of the applicability of the stay is no excuse. In *Taborski*, the Internal Revenue Service seized upon certain tax refunds without knowledge that the debtor claimed an interest in them. Upon being informed of the debtor's claim, the IRS made the decision not to immediately return the funds. The court found that the IRS' refusal to return the funds rendered its entire conduct willful. *Id.* at 967. *See also In re Peters*, 184 B.R. 799, 804 (9th Cir. BAP 1995) (violation of stay deemed willful when creditor knew of stay and intentionally performed acts in violation; "a good faith belief that creditor had a right to the property is not relevant"); *accord, In re Sumpter*, 171 B.R. 835, 843 (Bankr.N.D.Ill.1994), *In re MJ Shoearama, Inc.*, 137 B.R. 182, 190 (Bankr. W.D.Pa.1992).

In the present case, Bank knew no later than September 9, 1996, that the Third Case had been reinstated and that the Debtors were claiming the protections of the automatic stay. Bank also undertook its own independent investigation to determine that the Third Case had been reinstated. For whatever reason, Bank held on to, and ultimately sold, the Car, applying the funds which it received to a debt which had been discharged. The Bank also knowingly, intentionally and voluntarily informed the Debtors that it would not return the Car unless the Bank was paid additional monies in violation of the Final Plan. This Court has difficulty envisioning conduct more worthy of the title "willful."

■ In its defense, Bank argues that the order reinstating the Third Case did not give Bank sufficient notice that the automatic stay had been reinstated, and, as such, the conduct of the Bank should not be deemed to be willful. The Court is not persuaded. Bank is a large, sophisticated creditor; it has availed itself of counsel on at least two occasions in this case. By its own admission, it has 110 people in its division dedicated to the processing of bankruptcies where Bank is a creditor. The person responsible for that department (who was the only live witness presented by the Bank), has eight years' experience in the handling of bankruptcy matters. Bank employs a full-time trainer solely to educate Bank's employees on bankruptcy issues and procedures. Bank knew or should have known that the reinstatement of a case reinstates the automatic stay. Bank also knew or should have known that it is the bankruptcy court, and not the Bank, who determines the applicability and effect of the automatic stay in a given case. By Bank's own admission, it had been previously cited for violations of the automatic stay by other courts; it should have known the risks of acting on its own in this case. Bank also had the benefit of actual notice from the Debtors that Bank's conduct was objectionable. As the court noted in *In re Mullarkey*, 81 B.R. 280 (Bankr.N.J.1987):

The cases appear to be unanimous in their agreement that where a petition has been filed and the provisions of the automatic stay apply, a creditor who seeks to act against the property of the debtor must apply for relief from the stay to the Bankruptcy Court before continuing any action

to gain possession or enforce a lien against property of the estate. . . .

The importance of adherence to the requirements of the automatic stay cannot be overstated in this context. Particularly with such experienced bankruptcy counsel, with a substantial practice in the Chapter 13 area representing mortgage companies, who is so consistently involved in these processes, counsel's failure to seek relief from the stay prior to acting represents "an arrogant disregard for federal law" which must have as its consequence the awarding of punitive damages to the debtors.

*Id.* at 283, 284–285. It would have been a simple matter for Bank to ask the appropriate court for a determination as to the effect of reinstatement and the applicability of the stay to its actions. Had it done so, in all likelihood none of this would have happened. Bank knew what it was doing and undertook the risks of the same. It cannot now hide behind a contrived shroud of ignorance.

### D. Damages

Having determined that Bank willfully violated the automatic stay, the Court must next consider the issue of damages. Section 362(h) of the Bankruptcy Code provides that

An individual damaged by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

§ 362(h). For purposes of this discussion, the Court will treat the issue of actual and punitive damages separately.

#### 1. Actual Damages.

■ The Court has made the factual determination that the value of the Car on September 7, 1996, the date of repossession, was $2,500.00. In addition, the record establishes that Mr. Diviney was unemployed for a period of two weeks as a result of the repossession, resulting in lost wages of $315.00. These amounts are established by the record and will be included in the award of damages to the Debtors.[10] With respect to the amount of attorneys' fees to be awarded, the Court will allow counsel for the Debtors to submit an affidavit detailing the fees and expenses incurred in this matter so that the same may be included in the damage award.

■ Ms. Diviney has also sought an award of $6,000.00 for lost educational benefits. Apparently she had a scholarship to an educational institution in the Tulsa area which she claims to have lost as a result of the taking of the Car. No evidence was presented to the Court as to the exact nature and amount of the scholarship, or how the taking of the Car was the proximate cause of its loss. Accordingly, the Court finds that any award of damages for lost educational benefits would be speculative and declines to award the same.

■ As a final element of actual damages, the Debtors seek an award of $5,000.00 for "emotional distress because of the humiliation, anguish and duress they suffered because of the Bank's intentional stay violations." *Plaintiffs' Post–Trial Brief* at 23. The Debtors presented no medical testimony in support of their claim, although they do cite two cases where damages for emotional distress were awarded without such evidence. The Court has reviewed those cases and found them so factually dissimilar as to be inapplicable here. In the present case, the only evidence of any emotional distress is found in testimony that conversations between the Bank and the Debtors became heated at times, and that profanity was used in at least one of those conversations. The cases cited by the Debtors involved a much

---

**10.** Mr. Diviney also testified that, in addition to the lost hourly wages, he lost "tips" which he would have received from customers as he delivered pizzas. No testimony as to the amount of the tips was offered. The Court will not award damages for these lost "tips," as to do so would require the Court to engage in speculation as to their amount. *See In re Sumpter,* 171 B.R. 835, 844 (Bankr.N.D.Ill.1994).

clearer showing of emotional distress. *See In re Flynn,* 169 B.R. 1007, 1023 (Bankr. S.D.Ga.1994), *affirmed* 185 B.R. 89 (S.D.Ga. 1995) (debtor forced to cancel child's birthday party, had check refused in supermarket, and had concern regarding dishonor of other checks as a result of stay violation); *In re Carrigan,* 109 B.R. 167 (Bankr.W.D.N.C. 1989) (debtor accosted in his home in violation of the stay). The record before the Court does not justify an award of damages for emotional distress, and none will be made.

### 2. Punitive Damages.

■ In the brief in support of its motion for partial summary judgment, Bank cites Judge Covey's decision in *In re Fry,* 122 B.R. 427, 431 (Bankr.N.D.Okla.1990), as establishing the following standard for determination of whether punitive damages are appropriate:

> To recover punitive damages, the defendant must have acted with actual knowledge that he was violating the federally protected right or with reckless disregard of whether he was doing so.

*Id.,citing In re Wagner,* 74 B.R. 898 (Bankr. E.D.Pa.1987). Some courts have utilized four factors in determining whether punitive damages should be awarded:

> The following factors are relevant in determining whether to award punitive damages and the amount of such damages: (1) the nature of the defendant's conduct; (2) the defendant's ability to pay; (3) the motives of the defendant; and (4) any provocation by the debtor.

*In re B. Cohen & Sons Caterers, Inc.,* 108 B.R. 482, 487–488 (E.D.Pa.1989) (citations omitted) (footnote omitted); *accord, In re Sumpter,* 171 B.R. 835, 845 (Bankr.N.D.Ill. 1994); *In re M.J. Shoearama,* 137 B.R. 182, 190 (Bankr.W.D.Pa.1992). Under either of these standards, an award of punitive damages is justified on the facts presently before the Court.

As it sold the Car, and as it made demand on the Debtors for payments of amounts which it could not legally collect, the Bank certainly acted with "reckless disregard" of the provisions of the automatic stay. Bank, armed with knowledge that the Third Case had been reinstated, made a conscious, affirmative decision to sell the Car and seek collection of a deficiency which it was not entitled to under the terms of the Final Plan. Bank had ample opportunity to conduct whatever investigation and take whatever steps it deemed necessary to ensure that its conduct was correct and permissible before it took action. Instead of presenting the issue to this Court, Bank relied on its own internal judgment. This Court is clearly convinced that Bank knew or should have known that the automatic stay was in effect upon reinstatement of the Third Case, and chose to disregard the same. Thus, punitive damages are in order.

Punitive damages are also justified under the four part test outlined above. The nature of the Bank's conduct was shocking, if not outrageous. There can be no more clear and direct violation of the automatic stay than the taking of property of the estate and the refusal to return the same. Bank repossessed the Car, and, upon being informed of a pending bankruptcy case, and upon demand for return of the Car, held the Car hostage, first under the guise of requiring proof of insurance, but in reality, for the purposes of collecting finds in excess of which it was entitled. The motives of the Bank were in direct contradiction to the purpose of Chapter 13. Although the Bank attempts to portray the Debtors as the cause of this situation, the Court does not agree. The Debtors attempted on numerous occasions prior to the sale of the Car to inform the Bank of the wrongful nature of its conduct. Finally, although there was no significant evidence on the financial condition of the Bank, the Court has little concern with the Bank's ability to pay the damages assessed against it here.

The facts presented here are similar to those in *In re Baker,* 140 B.R. 88 (D.Vt. 1992). In *Baker,* debtor owned a motor vehicle subject to a lien held by a bank. The

bank, prior to repossession of the car, contacted the debtor and was informed that debtor intended to file a chapter 7 case. Immediately thereafter, bank hired a repossession agent to obtain the car. Debtor filed her Chapter 7 petition the next day; four days later, the bank repossessed the car. Upon request for the return of the car, bank advised the debtor that "the bank refused to return the car until the payments were made on it to date." *Id.* at 89. Debtor then filed an action against bank for violation of the automatic stay. In its defense, the bank claimed to have no knowledge of the imposition of the automatic stay at the time of the acts in question. After hearing, the bankruptcy court awarded punitive damages against the bank. On appeal, the district court affirmed. The following language from the district court's opinion is instructive:

> Specifically, the bank contends that it did know of the imposition of the automatic stay so that it did not have intent to violate such stay for purposes of section 362.
>
> Nonetheless, as Baker points out, the bank's argument is at odds with the Bankruptcy Court's factual findings, which are today upheld by this court. In order to justify an award of punitive damages for a violation of section 362(h), a debtor must make a showing of "maliciousness or bad faith in the part of the offending creditor." [citation omitted] **Because both the debtor and her attorney spoke with representatives of the bank on more than one occasion in order to inform it of debtor's bankrupt status, it does not behoove the bank to now plead ignorance. The only explanation for the bank's violation of the automatic stay can be malice or bad faith.** Accordingly, punitive damages were appropriate against the bank, and Judge Conrad's award was not clearly erroneous.

*Id.* at 91 (emphasis added). In this case, Bank was given ample notice of the rein-

statement of the Third Case. It does not behoove the Bank to plead ignorance here.

Were this Court to limit its award to the actual damages incurred by the Debtors, it would be sending a message to Bank and to all similarly situated creditors that compliance with federal bankruptcy law is optional at their discretion. If a creditor can willfully and in total disregard of the United States Bankruptcy Code ignore the automatic stay, and know that the only consequence is repayment of the actual harm which it caused, creditors will be encouraged to violate the stay when they think it economically justified. That is not what Congress intended, and it will not be the legacy of this Court.

▮▮▮ The Court is left finally to determine the amount of the punitive damage award. The purpose of awarding punitive damages is to deter the party and others similarly situated from undertaking conduct in violation of the automatic stay. *In re Kaiser*, 158 B.R. 808 (Bankr.D.Neb.1993). The amount of punitive damage awards in reported decisions reviewed by this Court range from $100 to $100,000. *See In re Sumpter, supra*, 171 B.R. at 846 and cases cited therein. This Court wishes to send a clear message that the conduct of the Bank in this case is not tolerable. Parties may not make their own private determination of the scope of the automatic stay without consequence. Although no direct evidence of the financial condition of Bank was presented to the Court, the Bank did present evidence that it is a large economic entity, with over 100 people working solely to oversee its bankrupt loans. On the basis of the facts before it, the Court determines that an award of $40,000.00 in punitive damages is appropriate. It is the intent of the Court that this award of punitive damages be sufficient to deter the Bank, and any other creditor similarly situated in the future, from unilaterally determining the scope and effect of the automatic stay.[11] In addition, Bank

11. In setting the amount of punitive damages in this case, this Court is mindful of the recent decisions of the United States Supreme Court

and U.S. Court of Appeals for the Tenth Circuit on the issue whether a punitive damage award may be so excessive as to be unconstitutional as

should be deprived of any further payment which it may receive as a result of further distributions under Debtors' Chapter 13 plan, it being the intent of this Court that Bank have no right of offset with respect to the sanctions imposed herein.

## IV. Conversion

■ Debtors have also sought damages against Bank based upon state law theories of conversion. The Court declines to do so, as any such relief would be cumulative to the relief granted pursuant to § 362(h).

## V. Conclusion

IT IS THEREFORE ORDERED that within ten (10) days hereof, counsel for the Debtors shall file with the Court a written statement of his fees and expenses and serve a copy of the same upon counsel for Bank. Bank shall have ten (10) days to object to the amount of the fees and expenses. If no objection is filed, then those fees and expenses requested by counsel for Debtor shall be allowed. If an objection is timely filed, then it shall be scheduled for hearing.

IT IS FURTHER ORDERED that judgment will be entered, upon determination of the attorneys' fees in the manner set forth above, against NationsBank of Texas and in favor of Apryl Alyse Diviney and Clifford Dale Diviney, Debtors herein, in the sum of $2,850.00 in actual damages, plus attorneys' fees and costs, and $40,000.00 in punitive damages.

IT IS FURTHER ORDERED that judgment will be entered, upon determination of the attorneys' fees in the manner set forth above, that Bank shall be paid nothing further on its claim in this case, and shall not share in any additional distributions which may be made under Debtors' Chapter 13 Plan, and/or any subsequent amendments thereto.

violative of due process. *See Pacific Mutual Life Insurance Company v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991); *BMW of North America v. Gore,* 517 U.S. ——, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *Continental Trend Resources, Inc. v. OXY USA, Inc.,* 101 F.3d 634 (10th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1846, 137 L.Ed.2d 1049 (1997); *Fed. Deposit Ins. Corp. v. Hamilton,* 122 F.3d 854 (10th Cir.1997). Each of these cases discusses the award of punitive damages as part of a state law tort claim. Since the matter before the Court involves the violation of a federal statute and an award of punitive damages is statutorily prescribed, it is arguable that these cases do not apply here. Even if they are applicable, the punitive damage award of $40,000.00 falls within their parameters. The Court expects that once counsel for the Debtors submits his itemization of fees and costs incurred in this matter, the total damages suffered by the Debtors will exceed $4,000.00. Assuming the same, the punitive damage award of $40,000.00 is within the "ten to one" ratio found generally acceptable by the Tenth Circuit. *Fed. Deposit Ins. Corp. v. Hamilton,* 122 F.3d at 859. Consideration of the attorneys' fees incurred is appropriate in the calculation of the punitive damage award. *Continental Trend Resources, Inc. v. OXY USA, Inc.,* 101 F.3d at 642.