**HANNA COAL CO., INC., Plaintiff,**

v.

**INTERNAL REVENUE SERVICE, Defendant.**

**No.CA 92–0071–B.**

United States District Court, W.D. Virginia, Big Stone Gap Division.

Nov. 6, 1997.

---

Robert Tayloe Copeland, Copeland, Molinary & Bieger, Abingdon, VA, for Hanna Coal Company, Inc.

Angelo Frattarelli, U.S. Dept. of Justice, Washington, DC, for Internal Revenue Service.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, Senior District Judge.

Hanna Coal Co. Inc. ("Hanna") seeks to recover damages for alleged violations of an automatic stay by the Internal Revenue Service ("IRS"). Hanna contends that the IRS willfully violated 11 U.S.C. § 362 (1997) by selling Hanna's mining equipment which was protected by a Chapter 11 bankruptcy filing. The court exercises jurisdiction pursuant to 28 U.S.C. § 1334 (1997).

### I. PROCEDURAL BACKGROUND

The current incarnation of the litigation between these parties arises from an auction sale of mining equipment conducted by the IRS in 1989 in Williamson, West Virginia ("Williamson"). Hanna contends that the IRS violated an automatic stay arising from Chapter 11 bankruptcy. The IRS asserts that Hanna failed to provide sufficient evidence of ownership to cancel the sale. The prior proceedings in this case have been recounted in an earlier opinion of the court entered on June 25, 1996. Since that opinion issued, a bench trial was held on August 26, 1997 before this court at Big Stone Gap, Virginia to receive evidence regarding the IRS' alleged violation of Hanna's automatic stay. Both parties presented evidence at the trial. Hanna offered the testimony of Carl McAfee ("McAfee"), Noal Bradley Lambert ("Lambert"), and Marvin Brown ("Brown") while the IRS offered the deposition testimony of IRS Revenue Officer James Payton ("Payton"). Pursuant to Fed.R.Civ.P. 52(a), the court issues the following findings of fact and conclusions of law.

### II. FINDINGS OF FACT

1. McAfee and Lambert owned a company known as Hanna Coal Co. Inc ., which was in the business of buying coal mining equipment and leasing it to mining operations.

2. Hanna leased certain pieces of mining equipment to Golden Shamrock Coal, Inc. ("Golden Shamrock") for use in a mine site located near Raglund, West Virginia.

3. Golden Shamrock filed for bankruptcy in 1989.

4. With Golden Shamrock in bankruptcy, Lambert hired Robert Smith ("Smith") to remove Hanna's equipment from the Golden Shamrock site.

5. At this time, Smith co-owned a mining operation known as PSB Mining Company ("PSB") with Brown and Charles Paterino ("Paterino").

6. Smith asked Brown to move Hanna's equipment from Golden Shamrock to a PSB mining site near Williamson, West Virginia. Smith told Brown that Lambert had given PSB permission to use the equipment in a PSB mine in return for moving the equipment.

7. Per Smith's directions, Brown moved equipment including top and bottom rollers, belts, a belt drive, tail pieces, water line, a belt transformer, high voltage cable, and a high pressure pump from Golden Shamrock

to the PSB site at Williamson where the equipment was put into use.

8. Sometime in mid–1989, Brown and Paterino sold their interest in PSB to Smith making him the sole owner.

9. Brown last saw Hanna's equipment in operation at the PSB site at Williamson in August or September of 1989.

10. Hanna filed for Chapter 11 bankruptcy on August 22, 1989.

11. Lambert learned that Hanna's equipment had been moved to the PSB site without his permission and he offered to sell the equipment for $17,225 in order to avoid legal action against PSB to compel the return of the equipment. This amount would have paid off liens on the property held by Sovran and Figgie Acceptance Corp. This offer included all of the equipment moved from Golden Shamrock to PSB except for the high voltage cable and a high pressure pump. A final agreement was never reached.

12. In 1990, IRS Revenue Officer Payton was assigned to collect delinquent employment taxes from PSB Mining.

13. When PSB was unable to raise sufficient funds to pay the taxes, Payton began the process of liquidating PSB's assets by requesting and reviewing lists of equipment allegedly owned by PSB. These lists were provided by Smith and the accountant for PSB, John Preece ("Preece").

14. Payton scheduled a sale of the mining equipment at the Williamson, West Virginia site for July 31, 1990.

15. In the summer of 1990, Brown learned of the scheduled sale from Preece and notified Lambert that the IRS was going to sell all of the equipment present at the PSB site at Williamson, West Virginia.

16. On July 31, 1990, McAfee and Lambert traveled to the sale site and confronted Payton informing him that certain equipment at the Williamson site belonged to Hanna which had filed Chapter 11 bankruptcy. Hanna did not claim to own all of the equipment at the site.

17. In response to McAfee and Lambert's assertions, Payton postponed the sale for 30 days and requested evidence of Hanna's ownership.

18. Payton received an August 13, 1990 letter with attached UCC filings from Robert Copeland, attorney for Hanna, detailing McAfee and Lambert's allegations and describing in general terms the equipment Hanna claimed to own at the Williamson site. The letter also reiterated that Hanna had filed Chapter 11 bankruptcy. The attached UCC filings consisted of financing statements of Sovran Bank and Figgie Acceptance Corporation listing Hanna's property. These lists included some mining equipment belonging to Hanna, that was not alleged to be at the Williamson site.

19. The UCC filings included possible serial numbers for some equipment alleged to be present at the Williamson site. They also listed manufacturer's names for certain items and quantities for generic equipment such rollers and cables.

20. Payton forwarded the information he received from Hanna to the IRS District Counsel's office in Cincinnati because he could not determine whether the IRS should continue with the sale in light of Hanna's claims.

21. Payton consulted Smith and Preece of PSB regarding Hanna's assertions and received their reassurance that PSB owned the equipment at issue. Smith and Preece produced records stating that PSB had been depreciating the assets in question for three years.

22. The IRS District Counsel's office cleared Payton to sell all of the equipment at the Williamson site.

23. Having received the clearance of the IRS District Counsel, Payton sold the equipment in a bulk sale for $25,000 to Sydney Coal on September 17, 1990.

24. No IRS file or history detailing Hanna's claims, the IRS District Counsel's decision to sell the Williamson property, or the actual sale of the equipment has been produced by the IRS.

## III. APPLICABLE LAW

### (1) *The Automatic Stay— 11 U.S.C. § 362(a)*

■ Hanna alleges that the IRS violated an automatic stay triggered by Hanna's filing for Chapter 11 bankruptcy. When a debtor begins bankruptcy proceedings, an automatic stay arises pursuant to 11 U.S.C. § 362. The Bankruptcy Code, specifically "11 U.S.C. § 362[,] provides generally for the automatic stay of any and all proceedings against a debtor once a bankruptcy petition is filed." *Budget Service Co. v. Better Homes of Virginia, Inc.*, 804 F.2d 289, 292 (4th Cir.1986). The automatic stay does not require actual notice to be effective. *In the Matter of Carter*, 16 B.R. 481, 483 (Bankr. W.D.Mo.1981), *aff'd*, 691 F.2d 390 (8th Cir. 1982). The function of the automatic stay provision is to halt all proceedings to collect against debtors once the petition in bankruptcy has been filed. "It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions." *In re Strumpf*, 37 F.3d 155, 159 (4th Cir.1994) (quoting House Report No. 95–595, 95th Cong., 1st Sess. 340–2 (1977); Senate Report No. 95–989, 95th Cong., 2d Sess. 54–55 (1978); reprinted in 1978 U.S.C.C.A.N. 5787 at 5840 and 6296–7). The Bankruptcy Code, at 11 U.S.C. § 362, provides protection from a number of different violations of an automatic stay. The provision relevant to the instant case, 11 U.S.C. § 362(a)(3), forbids "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." The alleged conduct of the IRS in selling Hanna's property would clearly constitute an act to obtain or exercise control over property. However, in order to prevail, a plaintiff alleging a violation of an automatic stay must also prove willfulness pursuant to 11 U.S.C. § 362(h).

### (2) *A Willful Violation—11 U.S.C. § 362(h)*

■ The Bankruptcy Code enforces the automatic stay at 11 U.S.C. § 362(h) which provides that "[a]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."[1] Section 362 thus requires Hanna to prove not only that an automatic stay existed, but that the IRS acted willfully. "To constitute a willful act, the creditor need not act with specific intent but must only commit an intentional act with knowledge of the automatic stay." *In re Strumpf*, 37 F.3d at 159 (citing *Budget Service Co.*, 804 F.2d at 292–93); *In re Atl. Business & Community Corp.*, 901 F.2d 325, 329 (3d Cir.1990). "Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was willful or whether compensation must be awarded." *In re Atl. Business & Community Corp.*, 901 F.2d at 329 (citing *In re Bloom*, 875 F.2d 224, 227 (9th Cir.1989).) Having established a willful violation, a plaintiff must then sufficiently prove actual damages and may receive attorneys' fees at the discretion of the trial court. *See John E. Green Plumbing & Heating Co., Inc. v. Turner Const. Co.*, 742 F.2d 965, 968 (6th Cir .1984), *cert. denied*, 471 U.S. 1102, 105 S.Ct. 2328, 85 L.Ed.2d 845 (1985) (quoting *Zirin Laboratories Int'l. v. Mead–Johnson & Co.*, 208 F.Supp. 633 (E.D.Mich.1962);) *In re Lile*, 161 B.R. 788, 794 (S.D.Tex.1993).

### (3) *Hanna's Burden of Proof*

■ While courts are in agreement that the burden rests with Hanna to prove the willful violation of the automatic stay by the IRS, there is a split among the bankruptcy courts as to the weight of the burden a plaintiff in Hanna's position must carry. A number of courts have held that plaintiffs alleging a violation of an automatic stay must prove their case by clear and convincing evidence.[2] *See In re Diviney*, 211 B.R. 951, 961

---

1. While the United States has waived its sovereign immunity with respect to suits filed pursuant to 11 U.S.C. § 362(h), both parties agree that an individual cannot recover punitive damages against the United States. *See* 11 U.S.C. §§ 106(a)(1) and 106(a)(3).

2. "Clear and convincing evidence leaves no substantial doubt in your mind. It is proof that establishes in your mind, not only [that] the proposition at issue is probable, but also that it is highly probable. It is enough if the party with the burden of proof establishes his claim beyond

(Bankr.N.D.Okla.1997); *In re Clarkson,* 168 B.R. 93, 94 (Bankr.S.C.1994); *In re Bennett,* 135 B.R. 72, 76 (Bankr.S.D.Ohio 1992); *In re Brockington,* 129 B.R. 68, 70 (Bankr.S.C. 1991). These cases however, offer no underlying reasoning or precedent to justify this ruling. Another line of cases requires that a plaintiff establish proof by a preponderance of the evidence. *See In re Sharon,* 200 B.R. 181, 199–200 (Bankr.S.D.Ohio 1996); *In re Meis–Nachtrab,* 190 B.R. 302, 305–306 (Bankr.N.D.Ohio 1995); *In re Sielaff,* 164 B.R. 560, 571 (Bankr.W.D.Mich.1994).

▇▇▇ The cases applying the preponderance standard cite *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), for the proposition that the preponderance of the evidence standard is applicable in civil actions between private litigants unless "particularly important individual interests or rights are at stake." *Id.* at 286, 111 S.Ct. at 659. Obviously, the instant case involves a civil suit against the government making *Grogan* only indirectly applicable. Nevertheless, simply because this case presents a claim by a private corporation against the government, the court is aware of no circumstances necessitating the application of the higher burden of proof.[3] Additionally, the court is persuaded to apply the preponderance standard by the maxim that the Bankruptcy Code is to be liberally construed in favor of the debtor. *See Williams v. USF & G,* 236 U.S. 549, 554, 35 S.Ct. 289, 290, 59 L.Ed. 713 (1915); *Roberts v. W.P. Ford & Son, Inc.,* 169 F.2d 151, 152 (4th Cir.1948). While Hanna is not a debtor with respect to the IRS because the IRS is not Hanna's creditor, Hanna is a debtor seeking bankruptcy protection. This status is sufficient to trigger the automatic stay of 11 U.S.C. § 362 and the protection which the IRS allegedly disregarded. *See In re Lile,* 161 B.R. at 792. For this reason, the court requires Hanna to

prove its claim by a preponderance of the evidence.

## IV. CONCLUSIONS OF LAW

As detailed above, 11 U.S.C. § 362 requires two pieces of evidence for Hanna to establish a willful violation of its automatic stay by the IRS. Hanna must first prove that the IRS knew that the equipment at Williamson belonged to Hanna and not to PSB. Hanna then must show that the IRS sold Hanna's equipment with knowledge of an automatic stay. The IRS asserts that Hanna failed to produce sufficient evidence of its ownership rights in the mining equipment at issue to justify cancellation of the scheduled sale. The IRS claims that it provided Hanna with an opportunity to establish ownership but that Hanna failed to provide documentation to support its claims. Based on the testimony offered in the August 26, 1997 trial, the court finds that the IRS had reason to know that the equipment it was selling belonged to Hanna and willfully violated Hanna's automatic stay by conducting the sale causing damage to Hanna.

### (1) *Hanna's Ownership of the Mining Equipment*

Hanna must first prove that it owned equipment at Williamson and that the IRS knew of this ownership. The testimony offered by Hanna, and in particular, that of Brown, proves that Hanna owned some of the equipment purchased by Sydney Coal. More importantly, the record in this case proves, contrary to the IRS' assertions, that the IRS had enough information to realize that the ownership of the equipment at Williamson needed further verification. Brown testified that he was the one who moved equipment from the Golden Shamrock site to the PSB site at Williamson and he noted that he last saw Hanna's equipment at the PSB site in September of 1989. Brown provides a

---

any 'substantial doubt'; he does not have to dispel every 'reasonable doubt.' " *In re Diviney,* 211 B.R. at 961 (citation omitted).

**3.** At least one court has attributed the varying burden in automatic stay actions to the fact that some violations are litigated as contempt proceedings which require a higher standard of proof. *See In re Sharon,* 200 B.R. 181, 199–200

(Bankr.S.D.Ohio 1996) (citing *Fidelity Mortgage Investors v. Camelia Builders, Inc.,* 550 F.2d 47 (2d Cir.1976) *cert. denied,* 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540; *In re Mack,* 46 B.R. 652 (Bankr.E.D.Pa.1985)). The instant case does not include contempt proceedings, thus providing further basis for the application of the preponderance standard.

direct link between Hanna and the equipment at Williamson. Brown also detailed negotiations between Lambert and PSB regarding the potential purchase by PSB of the equipment moved from Golden Shamrock. While Hanna and PSB discussed a purchase price of $17,225, the testimony of McAfee and Lambert confirms that a final agreement could not be reached. These negotiations were also described in Hanna's August 13, 1990 letter to Payton. Obviously, Hanna and PSB would not have engaged in purchase negotiations unless Hanna owned the equipment at issue. Furthermore, Brown notified Hanna when he learned that the IRS planned to liquidate PSB's assets; presumably because he realized that some portion of the jeopardized equipment belonged to Hanna. These facts carry Hanna's burden of proving that it owned some of the equipment subsequently sold by the IRS.

The trial testimony further reveals that the IRS received enough information to question PSB's claims of ownership and halt the sale. While the IRS argues that Hanna offered insufficient evidence of ownership to justify cancellation of the rescheduled sale, the court disagrees. Hanna's August 13, 1990 letter included attached UCC filings by Sovran Bank and Figgie Acceptance Corporation that listed Hanna's assets. These lists provided serial numbers for some specific items, manufacturers for others, and merely generic names and quantities for equipment like rollers and cables.[4] Hanna contends that the IRS may have been able to identify from these lists, at least some of the equipment at the Williamson site. The IRS argues to the contrary that the lists were too generic to provide evidence of Hanna's ownership. Having carefully reviewed the record in this case, the evidence is clear that the IRS failed to adequately investigate Hanna's claims before selling the contested equipment.

The court is unable to determine whether the IRS even attempted to match Hanna's UCC lists to any equipment in Williamson. Payton testified that "If we did have [Hanna's] pieces, I can say there were no serial numbers to be found by us." (Payton Dep. at 14). In the same deposition however, Payton is uncertain whether he even saw the UCC filings containing the serial numbers. At other times Payton seems to acknowledge receipt of the August 13, 1990 letter with the attached UCC filings. (*Id.* at 12, 14, 34). Payton's confused testimony makes clear the fact that the IRS did not seriously consider Hanna's claims. Payton's own investigation appears to have consisted solely of discussions with Smith and Preece who offered depreciation schedules to back their claim to the equipment at issue. (*Id.* at 15). While Payton generally testified that he had contact with Hanna regarding its claims after the July 31, 1990 discussion, the IRS has not produced the file that Payton claims would contain documentation of such conversations. Additionally, the IRS has offered no case file or history of any sort of investigation or inquiry into Hanna's contentions. (*Id.* at 18–20).[5] Payton cannot even definitively say whether he notified Hanna of the IRS' final decision or the date of the second sale. (*Id.* at 17, 39).

Payton acknowledges that the information provided by Hanna created a difficult decision. In his deposition Payton referred to this quandary as "a close call." (*Id.* at 38). In accordance with IRS procedures, Payton turned to District Counsel in Cincinnati to make the decision, which in turn, cleared Payton to sell the equipment. (*Id.* at 16, 37). Payton testified that he forwarded all the information he received from Hanna to the IRS but does not mention whether he sent any information regarding the existence of serial numbers or manufacturer's names on the equipment to the District Counsel's office. The IRS has offered no proof of any

---

**4.** Serial numbers were provided for the belt drive and high pressure pump and a manufacturer's name for the high pressure pump as well. Quantities were given for generic items like rollers and cable. Any of these descriptive characteristics could have been referenced to test Hanna's claims, yet the IRS merely maintains that Han-

na's lists were too "generic." (Payton Dep. at 35, 38).

**5.** The IRS claims to have been unable to locate any such file which, Payton testified, would contain records of his conversations with McAfee and Lambert. (Payton Dep. at 18–20.)

inquiry conducted by District Counsel in this case. No evidence exists that the District Counsel investigated the equipment on the hillside or contacted Hanna for further information even though the IRS's own revenue officer, who was present at the site with the equipment, could not decide whether Hanna's claim was valid. While Hanna's UCC filings may not have provided conclusive evidence of Hanna's ownership to the IRS, they put the IRS on notice that there was a question as to whether PSB owned all of the equipment at Williamson. *See In re Lile,* 103 B.R. 830, 837 (Bankr.S.D.Tex.1989) (conversation between IRS agent, debtor, and debtor's attorney regarding ownership of certain property was sufficient to cause a reasonably prudent person to make further inquiry before seizing the property), *aff'd, In re Lile,* 161 B.R. 788. On the facts of this case, enough questions were raised to, at the very least, prompt greater investigation by the IRS.

### (2) *The IRS' Willful Violation*

Even if the IRS had reason to believe that Hanna owned some of the equipment at issue, the second prong of 11 U.S.C. § 362 requires that Hanna prove that the IRS willfully ignored Hanna's status in bankruptcy and the resulting automatic stay. As noted above, willfulness in the context of § 362 does not engender a showing of specific intent. *Budget Service Co.,* 804 F.2d at 292–93. Willfulness merely involves a deliberate act taken with knowledge, and in contravention of an automatic stay. *In re Strumpf,* 37 F.3d at 159. Having proven that the IRS had notice of Hanna's ownership, Hanna need only prove that the IRS also had notice of Hanna's bankruptcy to establish that the sale was a willful violation.

Hanna's automatic stay arose on August 22, 1989 when Hanna commenced Chapter 11 proceedings. McAfee and Lambert both testified that they informed Payton of the Chapter 11 filing when they confronted him at the originally scheduled sale on July 31, 1990. Payton later received a letter from Mr. Copeland on behalf of McAfee and Lambert reiterating to the IRS both Hanna's claim to the equipment and Hanna's rights in bankruptcy. (Payton Dep. at 14, 42–43). Since the willfulness requirement of 11 U.S.C. § 362 merely requires a deliberate act taken with knowledge of an automatic stay, there is no doubt that the sale by the IRS constituted willful action. Having concluded that the IRS knew of Hanna's bankruptcy, the court attributes to the IRS the knowledge that a bankruptcy filing gives rise to an automatic stay. Knowing that PSB's ownership of the equipment was questionable, and that the potential true owner had filed for bankruptcy, 11 U.S.C. § 362 required the IRS to respect Hanna's automatic stay.

### (3) *Damages*

Having found a violation of 11 U.S.C. § 362, the court must determine the appropriate measure of damages to award Hanna. "A damage award [under § 362(h) ] must not be based on 'mere speculation, guess, or conjecture.'" *In re Gault,* 136 B.R. 736, 739 (Bankr.E.D.Tenn.1991) (quoting *John E. Green Plumbing & Heating Co. v. Turner Const. Co.,* 742 F.2d at 968.) Hanna asserts that the fair market value of the equipment sold, as calculated by McAfee and Lambert, is $38,400. The IRS contends that Sydney Coal paid only $25,000 for the entire Williamson sale including equipment not claimed by Hanna. The IRS also relies on testimony indicating that Hanna, at one time, was engaged in negotiations with PSB to sell most of the equipment at issue for approximately $17,225.

While McAfee and Lambert testified that the fair market value of their equipment was $38,400, the evidence in this case compels a lesser award. Hanna's own letter, sent to Payton on August 13, 1990, reveals that Lambert reached an agreement with PSB to sell nearly all of the equipment at issue in this case for $17,225. The only items excluded from this offer, according to the letter, were 1,000 feet of high voltage cable and one high pressure pump. These items were valued in a July 9, 1991 letter from Hanna's accountant to Mr. Copeland which McAfee referenced in his trial testimony. In the July 9, 1991 letter, the high voltage cable and the high pressure pump were valued at $3,500 and $3,000 respectively, totaling $6,500. By adding this amount to the $17,225 offer made to PSB, the court finds that Hanna is entitled

to damages of $23,725. Hanna has failed to offer anything more than conclusory evidence of the fair market value of its property. For this reason, the court concludes that the negotiations between Hanna and PSB offer the most concrete values available. By using the July 9, 1991 letter to value the two items excluded from these negotiations, Hanna is given the benefit of the doubt at least with regard to these two pieces of equipment. Any shortfall which, in Hanna's estimation, may be created by this award, can be attributed to the lack of specific valuation evidence presented by Hanna. Hanna has offered minimal guidance in assessing its damages and as a result, the court concludes that $23,725 adequately compensates Hanna for its lost equipment.

In addition to the above compensatory damages, 11 U.S.C. § 362(h) permits attorneys' fees to be awarded where a debtor is forced to resort to the courts to enforce his rights. 11 U.S.C. § 362(h); *see Budget Service Co.,* 804 F.2d at 292–93. Hanna has been made to litigate this matter and should be compensated for its fees and costs. Accordingly, Hanna is ordered to submit its costs to the court for calculation of the appropriate amount of attorney's fees.

## V. CONCLUSION

The record evidence establishes beyond a preponderance that the IRS had reason to believe that something was amiss in Williamson. While the documentation provided to the IRS by Hanna may have been inconclusive, it put the IRS on notice and should have prompted further inquiry. Payton's conversations with McAfee and Lambert and the August 13, 1990 letter and attached filings should have led the IRS to more carefully consider who owned the property it was selling. The IRS knew there was a question as to the ownership of some of the property and that Hanna, the claimant, was protected by an automatic stay. Nevertheless, the IRS made a conscious decision to proceed with the sale. Conducting the sale under these circumstances constituted a willful violation of 11 U.S.C. § 362 by the IRS. An appropriate order will be entered this day.

### ORDER

For the reasons stated in the Memorandum Opinion entered this day, it is hereby ADJUDGED and ORDERED that the Plaintiff is granted compensatory damages of $23,725. Plaintiff is ORDERED to submit records detailing its attorneys' fees and expenses within 30 days from the date of this Order.

The Clerk is directed to send certified copies of this order to all counsel of record.