## In re MOUNTAINEER COAL COMPANY, INC., Debtor.

**Mountaineer Coal Company, Inc., Plaintiff,**

v.

**Liberty Mutual Insurance Co., Defendant.**

Bankruptcy No. 7–94–00229–WSB–11.
Adversary No. 7–96–00097.

United States Bankruptcy Court,
W.D. Virginia,
Roanoke Division.

April 11, 2000.

Robert T. Copeland, Copeland, Molinary & Bieger, Abingdon, VA, for Mountaineer Coal Company, Inc.

James E. Green, Green & Hale, Bristol, TN, for Liberty Mutual Insurance Co.

## MEMORANDUM OPINION

WILLIAM F. STONE, Jr., Bankruptcy Judge.

The Plaintiff, Mountaineer Coal Company, Inc., ("Mountaineer") is a Virginia Corporation owned by Stephen Douglas Halsey and Carl A. Hamilton. Wolverine Coal Company, Inc., ("Wolverine") also is or was a Virginia Corporation owned by Messrs. Halsey and Hamilton. Both companies were involved in the coal mining business and had to obtain workers' compensation insurance in order to operate. The Defendant, Liberty Mutual Insurance Company, ("Liberty Mutual") provided workers' compensation insurance to both companies under one policy. This Adversary Proceeding is a dispute between Mountaineer and Liberty Mutual arising out of the insurance coverage provided to Mountaineer and Wolverine both pre-petition and post-petition. A number of questions are raised by this dispute, but the principal issues concern whether Mountaineer is liable for that portion of the premium applicable to Wolverine's application of a refund applicable to Mountaineer's post-petition operations to liability arising from Wolverine's post-petition operations, and the alleged failure of Mountaineer to refund to the Debtor-in-Possession claimed overcharges for post-petition insurance coverage.

The parties are in agreement that this Adversary Proceeding constitutes a "core" proceeding under 28 U.S.C. § 157(b)(2).

### Findings of Fact

Up until September 1, 1991 Mountaineer and Wolverine were named insureds under a workers' compensation insurance policy issued by Old Republic Insurance Company ("Old Republic"). Several months before the expiration of this policy Old Republic gave notice that the policy would not be renewed due to the loss history of Mountaineer. Mountaineer and Wolverine could not continue lawfully to operate their coal mining businesses without workers' compensation insurance. The companies' insurance agent, Mr. John W. Jarvis of Jarvis Insurance Associates, Inc., advised them that Mountaineer would be unable to obtain a new workers' compensation insurance policy without paying a substantial initial premium, which Mountaineer was not in a position to do, and came up with the idea of applying for and obtaining a policy for Wolverine alone, which would require a much lower initial premium payment. Once that policy was obtained for Wolverine, Mountaineer would be added to the policy as an additional named insured so that the initial large payment which would otherwise be required as a result of Mountaineer's loss history would be avoided. While the extent to which Messrs. Halsey and Hamilton were familiar with all the details of this plan is unclear, it is clear that they authorized Mr. Jarvis to do whatever was necessary to obtain the insurance coverage necessary for the companies to continue operating.

Pursuant to this plan, Mr. Jarvis, working with Mrs. Clara Funk, the bookkeeper for both Wolverine and Mountaineer, did obtain the issuance by Liberty Mutual of a workers' compensation insurance policy to Wolverine based on its more favorable loss history. Once the policy was issued, Mr. Jarvis filed the form necessary to request Liberty Mutual to add Mountaineer as an additional insured under the Wolverine policy. Liberty Mutual agreed to do so without requiring any disclosure of Mountaineer's prior loss history. It is apparent that Mr. Jarvis realized that there was a gap in Liberty Mutual's underwriting procedures and exploited that gap for the benefit of Mountaineer. While Jarvis, Mountaineer, and Wolverine all intended from the very beginning to obtain insurance coverage for the benefit of both Wolverine and Mountaineer, this intent was not disclosed to Liberty Mutual. It is apparent that, absent this maneuver, Mountaineer would not have been able to obtain the insurance coverage it needed at a price it was able to pay. To add Mountaineer to Wolverine's policy it was necessary that Liberty Mutual's form no. ERM–14 be completed and signed on be-

half of Mountaineer (Defendant's Exhibit I). This was done and on or about December 9, 1991 Mr. Jarvis received a copy of the endorsement adding Mountaineer, retroactive to September 1, 1991, as an additional named insured to Wolverine's policy. Jarvis immediately sent a memo to Mountaineer and Wolverine advising them of the amendment of the policy. Mountaineer apparently continued to operate during the period September 1, 1991–December 9, 1991 without assurance that it was actually going to be provided coverage under the policy issued to Wolverine.

Under the course of dealing among the parties, the companies were required to pay an estimated premium based on a projected payroll. Regular audits were conducted thereafter to determine the actual amount of payroll. After the audit was conducted, Liberty Mutual would either bill the companies for any underpayment of premium or refund to them or credit to their account any overpayment. The companies continued to be covered under one policy of insurance and to receive one joint billing statement. At no time did either Wolverine or Mountaineer request that separate policies be issued or that separate billing accounts be established. One statement would be issued and Mrs. Funk would ordinarily allocate the premium based on the companies' respective payrolls and would write checks from each company for its respective allocated share of the total premium. However, when one company or the other was not in a position to pay its proper share of the total premium, the other company would pay the entire premium payment due. When Liberty Mutual conducted its audits of the companies' payrolls, it would combine the payrolls to determine the correct aggregate premium and therefore the appropriate adjustment to such premium at the end of the policy year. If any additional premium was due, it would send one joint statement. While Liberty Mutual was certainly aware that it was dealing with two legally distinct companies, it treated the relationship as one policy and therefore one account. There's no lan-

guage in the policy which expressly provides what the liability is of named insureds for the total premium when the policy insures more than one employer.

Part Five of the General Section of the policy, the language of which remained constant for all policy years in question, provided that the premium would be calculated from the insurer's manuals of rates according to the proper classifications based on the insured's actual operations and upon the payroll for all employees "engaged in work" for which the insurer could be liable. It further provided that the premium shown on the Information Page was an estimate and that the final premium would be determined "after the policy ends" by using the proper rates to the insured's actual operations, after which

"If the final premium is more than the premium you paid to us, you must pay us the balance. If it is less, we will refund the balance to you."

Paragraph E, Part Five of General Section of Policy, Exhibits K, X, Y, Z and F–1. The policy language doesn't provide a date by which such determination is to be made but paragraph G of Part Five allows Liberty Mutual to conduct an audit "within three years after the policy period ends."

Although Wolverine and Mountaineer fell behind in their payment requirements and built up a substantial balance due to Liberty Mutual in the 1992–93 policy year, the insurer continued to renew the policy. By the time Wolverine and Mountaineer both filed voluntary Chapter 11 petitions in this Court on February 7, 1994, they had incurred, according to Liberty Mutual's proof of claim, a total pre-petition liability to Liberty Mutual of $544,476. Liberty Mutual was listed as a creditor in each of the petitions and filed a proof of clam in both cases in the amount of $544,-476. Subsequent review indicated, however, according to Liberty Mutual, that the pre-petition premium deficiency was a total of $662,014, of which $356,372 was attributable to Wolverine's operations and $305,642 was attributable to Mountai-

neer's. Wolverine ceased active operations within a few months after filing its petition on February 7, 1994 and its case was converted to Chapter 7 on August 22, 1994. Mountaineer continued to operate until the spring of 1997 and its policy was terminated at its request on May 29, 1997. Despite the bankruptcy filings of both companies, this arrangement between them and Liberty Mutual continued in the same manner as it existed prior to bankruptcy until Wolverine was deleted from the policy. Liberty Mutual continued to cover both companies under one policy and continued to send one statement for the premiums which were due. The evidence does not indicate that either Mountaineer or Wolverine made any request as Debtor–in–Possession to Liberty Mutual that separate policies be issued or separate billing accounts be established other than the request in 1994 that Wolverine be deleted from the policy.

After the bankruptcy filings, various disputes developed between Liberty Mutual and the coal companies regarding the deposit premiums required by Liberty Mutual, the calculation of policy premiums, and Liberty Mutual's refusal to refund amounts which the coal companies deemed to be overcharges. The inability of the parties to resolve these disagreements ultimately resulted in the filing of this Adversary Proceeding by Mountaineer. Its Complaint asserted the following contentions:

1. That Mountaineer was not liable to Liberty Mutual for workers' compensation insurance premium liability applicable to Wolverine's pre-petition operations.

2. That Liberty Mutual was either incorrectly including or incorrectly calculating an adjustment to the regular premium for the policy under a program know as "The Assigned Risk Adjustment Program or ARAP," a contention subsequently abandoned prior to trial.

3. That an administrative claim in the amount of $30,073 properly due Liberty Mutual for post-petition insurance coverage should be offset from alleged post-petition overpayments made to Liberty Mutual and therefore should not be allowed as an administrative expense against the estate.

4. That as a result of "mis-calculation or other action" Liberty Mutual had allegedly received an overpayment from Mountaineer for post-petition insurance coverage in the amount of $128,544, later amended to $246,366.64, or a net amount of $216,293.64 after offset of the agreed administrative claim in the amount of $30,073.

Although not specified with particularity in the pleadings, the general claim of premium overpayment, comprising the fourth contention immediately above, consisted of three elements:

1. Whether the total payroll upon which the premium was calculated should be reduced by the amount of vacation pay compensation;

2. Whether the proof of workers' compensation insurance in effect for employees of a contract hauler (K & T Trucking) had been provided to Liberty Mutual so that such hauler's payroll should be excluded from the payroll base upon which the policy premium for Liberty Mutual's policy was calculated; and

3. Whether Liberty Mutual's premium calculation failed to reflect a lower premium rate which was implemented during one of the post-petition policy years.

Liberty Mutual's final audit for the 9/1/93–9/1/94 policy year indicates there was a total post-petition premium deficiency of $113,449.00 of which $86,019 was attributable to Mountaineer's post-petition operations and $27,430 was attributable to Wolverine's. It further calculated, based on an audit concluded on November 16, 1995 for the 9/1/94–9/1/95 policy year, all of which was attributable to Mountaineer's operations, that a refund for that year in the amount of $128,554 was due. Netting that overpayment against the prior policy year's post-petition deficiency yielded a

difference of $15,105. This amount was disputed by Mountaineer, which contended that a much larger refund was due. As a result of the dispute, Liberty Mutual did not make any refund until after the Complaint initiating this Adversary Proceeding was filed on April 8, 1996. Thereafter, counsel for Liberty Mutual tendered a check dated May 14, 1996, in the amount of $15,105 to counsel for Mountaineer on or about May 23, 1996. The offset of the earlier year's deficiency against the following year's overpayment resulted in Mountaineer's funds being applied against Wolverine's post-petition deficiency in the amount of $27,430. Mountaineer refused to accept this amount and returned the check to Liberty Mutual's counsel despite the fact that such counsel's letter had not stipulated that such check was being tendered as an accord and satisfaction between the parties. Mountaineer's counsel did not make any inquiry as to whether such check might be accepted and deposited to Mountaineer's account without prejudice to its contentions asserting that a much larger refund was due. Subsequently, Liberty Mutual issued a new check dated October 1, 1998 in the same amount of $15,105 and this time the check was accepted and deposited.

By October 30, 1996 Liberty Mutual had completed its audit for the 9/1/95–9/1/96 policy year and determined that an overpayment in the amount of $78,372 had occurred. On December 4, 1996 it issued a check in the amount of $86,629 payable to "Wolverine Coal Co. Inc. ETAL" which was endorsed on behalf of Wolverine and Mountaineer and deposited to Mountaineer's account. On the evidence presented, the Court hasn't been able to determine the reason why this check was issued in the amount noted.

While Mountaineer requested on May 2, 1997 that the coverage be terminated, it requested an early audit to determine any refund due. This audit was conducted in the summer of 1997. Initially, Liberty Mutual denied that any refund was due. Although by the time of trial the auditor who had conducted the disputed policy premium audits for Liberty Mutual, Mr. Carlton Courtney, was no longer with the company and did not testify, another company auditor, Mr. Perola Andersson, who was familiar with the calculation of premiums for workers' compensation policies of the type issued to Wolverine and Mountaineer, did testify. He testified that vacation pay was regularly allowed as a deduction from gross payroll for the purpose of premium calculation and could not explain why it had not been initially allowed in this case. He ventured that Courtney might not have been able to determine the amount of vacation pay at the time of his audit. It was uncontradicted from the evidence that such offsets had always been previously allowed during prior premium calculation audits. Neither of the company witnesses, Mr. Andersson and Ms. Sherry Holcombe, who testified at trial, had actually reviewed the audit file compiled by Mr. Courtney. Accordingly, they were not in much of a position to explain why Liberty Mutual had taken the positions it had. Mrs. Clara Funk, the companies' bookkeeper, testified on the issue of vacation pay deduction from gross payroll and also the fact that she had provided an insurance certificate proving the existence of required coverage for the contract hauler. She testified that not only had she personally given a copy of this insurance certificate to Mr. Courtney, but also that she had subsequently faxed a copy of it to him when he requested it. The Court found Mrs. Funk to be a credible witness and accepts her account of the matter. Although during the pendency of this proceeding Liberty Mutual did ultimately refund to Mountaineer the premiums applicable to inclusion of vacation pay and the contract hauler's payroll in the gross payroll amount upon which the premium was calculated, it did not do so until on or about February 2, 1999 when it tendered a check payable to Mountaineer in the amount of $102,067, and, then, subject to its right to argue that such inclusion was proper under the policy contract. At trial, however, it did not offer any evidence re-

butting the factual contentions made by Mrs. Funk or otherwise supporting its claim of entitlement to the premiums in question applicable to the vacation pay and payroll for the contract hauler. Prior to the refund of premium applicable to vacation pay and the contract hauler's payroll, Liberty Mutual had, in addition, refunded to Mountaineer the sum of $54,353 on or about October 1, 1998 reflecting the change in applicable rate which had occurred during the 9/1/96–5/29/97 policy year. This refund occurred as a result of a review conducted by its personnel in preparation for scheduled depositions in this adversary proceeding. Although counsel for Mountaineer, by letter dated October 8, 1997 with supporting documentation, had previously notified counsel for Liberty Mutual of the insurer's failure to give recognition to this rate change, this information was either ignored or disregarded.

To add yet another complicating event to the tortured post-petition dealings between these parties, Liberty Mutual's principal trial witness, Mr. Andersson, realized during his final preparation on the very eve of trial that the calculation upon which the $102,067 refund check had been issued for the 9/1/96–5/29/97 policy year was grossly in error to the tune of $84,847 (Exhibit # 85). The mistake had occurred because the earlier calculation had excluded all of the contract hauler's payroll from the payroll base rather than just the amount which had earlier been included in such base as a result of Mr. Courtney's audit. This discovery was not disclosed to either Mountaineer's counsel or the Court before trial and came out as a part of Mr. Andersson's testimony, subject to the objection of Mountaineer's counsel. Notwithstanding Mr. Andersson's calculations, the Court finds that the actual express refund for the policy year in question was actually $76,590 based on total premiums paid by Mountaineer for such year of $332,739 (derived from Exhibits 67 and 75) against a final premium of $252,909 (derived from Exhibit 85), a difference of $79,830, less refunds of $54,353 and $102,-067 (Exhibit U), resulting in an excess refund of $76,590 for such year.

### Issues and Conclusions of Law

I. *Liability of Mountaineer and Wolverine for Pre–Petition Premium Liability*

■ Considering the frequency with which business insurance policies are issued which cover multiple named insureds, it is surprising that there appear to be relatively few cases adjudicating the nature of the insureds' liability for the premium due for the policy. It is likewise surprising that language specifically addressing this issue is not included in such policies as a routine provision.

In the case of *Over the Road Drivers, Inc. v. Transport Ins. Co.*, 637 F.2d 816 (1st Cir.1980), involving a workers' compensation policy covering six affiliated companies, it was held that the insurer failed to produce sufficient facts to establish joint and several liability of the companies insured by the policy to avoid the companies' motion for summary judgment on this issue. The companies' evidence was that the policy contained no provision as to the nature of the liability and that the practice had been that each company was billed separately for its allocated share of the total premium. The insurer failed to offer any factual allegations concerning the history of formation of the insurance contract and the course of dealing between the parties which would indicate that it was the mutual intention of the insurer and the insureds that premium liability would be joint and several. *Over the Road Drivers, Inc., supra*, 637 F.2d at 819–820, fn. 4. *See generally* 5 Holmes' Appleman on Insurance 2d § 24.11 (2d Ed.1998).

In the proceeding before the Court, no evidence was produced which would establish that Mountaineer and Wolverine had any understanding at all as whether their liability vis-a-vis Liberty Mutual was separate and pro-rata or joint and several. The premiums were invariably billed on

one statement and the companies paid such statements as best they could without ever requesting that separate billing accounts be established.

Liberty Mutual relies upon the case of *Hartford Accident and Indemnity Company v. L & T, Inc.,* for the proposition that a party who accepts the benefits of a contract cannot escape its burdens, 455 So.2d 1074 (Fla.1st DCA 1984); *citing Smith v. Edward M. Thompson Agency, Inc.,* 430 So.2d 859 (Ala.1983). The Florida Court noted as follows:

> As a general rule, a party who accepts the benefits of a contract cannot escape its burdens, so that a named insured included on a policy at the request of another named insured becomes obligated to pay the premiums by accepting coverage under the policy. (citation omitted) Therefore, there was at least a prima facie legal obligation on the part of appellees to pay the premiums when the settlement agreement was made, contrary to the conclusion of the court below that only Lane Lines was obligated for the premiums. We leave open to the parties the opportunity to introduce evidence to show by agreement or course of conduct that appellees were not intended to be responsible for premiums on the insurance policies or did not, in fact, ever accept coverage under the policies so as to become obligated for the premiums.

455 So.2d at 1076. *See generally,* 45 C.J.S. 191, Insurance § 451 (1993).

Under the circumstances of this proceeding, particularly the facts that Mountaineer could not acquire insurance coverage on its own, that it received a substantial benefit by Liberty Mutual's agreement to add it as an additional insured under Wolverine's policy, and that joint premium statements were issued for several years on the policy without any request for change by either Wolverine or Mountaineer, the Court concludes that Mountaineer and Wolverine, through their authorized agent, requested that they both be insured under one policy and that such request has a particular legal consequence, namely, their joint and several liability for all pre-petition premium liability upon the policy. Even in the absence of any express language in the policy governing premium liability of multiple insureds, the Court believes that under the particular course of dealing between these parties, Mountaineer and Wolverine are both obligated to pay the total premium liability in the amount of $662,014.00 for pre-petition coverage from which they jointly benefitted.

### II. *Post–Petition Premium Liability*

■ The Court further concludes that the joint and several liability for pre-petition coverage does not follow through to post-petition liability. The Chapter 11 filings effected a new relationship between the parties. The insured companies became debtors-in-possession. Their pre-petition debt to Liberty Mutual became claims against their respective bankruptcy estates as of the date of filing. When Liberty Mutual provided insurance coverage for post-petition operations of the debtor companies, it became entitled to an administrative expense claim for any unpaid post-petition premiums. It was on notice that the insureds were the subject of separate bankruptcy proceedings and had separate estates. To permit Liberty Mutual to have an administrative expense claim against Mountaineer for Wolverine's post-petition operations and vice-versa would be potentially prejudicial not only to other administrative expense claimants in the case of a bankruptcy estate having an administrative expense insolvency, but also to creditors of one or the other estates in the event of a sufficient estate to permit a distribution to creditors. Even in the absence of a request from either debtor-in-possession to Liberty Mutual to treat them separately thereafter, Liberty Mutual, once on notice of the filings, was bound to do so. To allow otherwise would permit improper claims to be created against the estates by default and without notice to

any of the creditors or other parties affected by such claims. Accordingly, the Court finds that Liberty Mutual had no right to use an overpayment from Mountaineer for the 8/1/94–9/1/95 policy year to cover its claim against Wolverine for its post-petition operations during the 9/1/93–9/1/94 policy year.

### III. Offset of Administrative Claim Against Alleged Refund Claim

The Bankruptcy Code expressly recognizes the right of offset as to pre-bankruptcy claims and demands between debtor and creditor. Bankruptcy Code § 553. There appears no good reason why any mature liquidated post-petition obligation to Mountaineer from Liberty Mutual cannot be offset against a mature liquidated post-petition claim of Mountaineer against Liberty Mutual. Indeed, from the pleadings, it does not appear that there is any dispute between the parties on this point. For the reasons noted above in the preceding paragraph, however, there is no right of offset of a post-petition obligation to Mountaineer from Liberty Mutual against the latter's post-petition claim against Wolverine and vice-versa.

### IV. Disallowance of Liberty Mutual's Claim Pursuant to § 502(d)

Bankruptcy Code § 502(d) requires the Court to disallow the claim of any entity which has failed to pay to the estate any amount recoverable from that entity under sections 542, 543, 550 or 553 or avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a). Beyond the fact that such section would not appear applicable unless and until a finding under one of the cited sections had been made and then the claimant had failed to comply with such ruling, in this case the section is inapplicable in light of the Court's determination that no net amount is recoverable from Liberty Mutual as of the date of this opinion.

### V. Applicability of Turnover Provisions of Section 542 to Mountaineer's Claims Against Liberty Mutual

While this issue raises a number of intriguing questions which the Court has explored in considerable depth, in view of the Court's ultimate conclusion that no amount is actually now due from Liberty Mutual to Mountaineer under the facts presented to the Court, it has become moot. Accordingly, the Court's conclusions on these questions would be simply dicta and therefore have been deleted from this opinion.

### VI. Applicability of Post–Petition Transfer Provisions of Section 549 to Refund Claims

The Debtor in Count IV of its complaint alleges that the premium payments made post-petition by Mountaineer with Liberty Mutual constitute post-petition transfers which are avoidable under 11 U.S.C. § 549(a) to the extent they exceeded the actual premiums ultimately determined to be due. Not surprisingly, Liberty Mutual disagrees with this contention and makes the following points:

1) By its terms § 549(a) is inapplicable to transfers which are "authorized under this title."

2) Under § 11 U.S.C. 363(c) the trustee or debtor-in-possession "may use property of the estate in the ordinary course of business without notice or a hearing" when the debtor's business is authorized to be operated under section ... 1108 of this title.

3) The debtor-in-possession was entitled to and did continue operating its business during this case pursuant to 11 U.S.C. § 1108.

The Court agrees with Liberty Mutual's analysis of the matter and concludes that § 549 was not intended to apply, and is not by its terms applicable to, a dispute of the type presented by this adversary proceeding.

*VII. Violation of the Automatic Stay.*

    A.   Setoff of Mountaineer Post–Petition Refund Against Wolverine Post–Petition Premium Deficiency.

■ This Court has previously held in section II above that Mountaineer is not liable for Wolverine's post-petition operations insurance expense liability and vice-versa. 11 U.S.C. § 362 defines what actions the automatic stay prohibits. One of the section's sub-sections expressly prohibits the "setoff of any debt owing to the debtor" but goes on to add the language "that arose before the commencement of the case." 11 U.S.C. § 362(a)(7). The only sub-section which can be applicable to the present dispute is (a)(3):

> Any act to obtain possession of property of the estate or to exercise control over property of the estate;

11 U.S.C. § 362(a)(3). The "exercise control" language of this sub-section was added by Congress in the Bankruptcy Amendments and Federal Judgeship Act of 1984 without apparently any legislative history to indicate what prompted the addition of this language or its intended scope. *In re Del Mission, Ltd.,* 98 F.3d 1147, 1151 (9th Cir.1996); *United States v. Inslaw, Inc.,* 932 F.2d 1467, 1473 at fn. 3 (D.C.Cir.1991). *Collier on Bankruptcy* asserts that a violation of § 542 should be deemed a violation of the automatic stay under § 363(a)(3) as being an exercise of control over property of the estate.

> This provision [§ 362(a)(3) ] should be read with Sections 542 and 543, which assist the trustee in obtaining possession of property of the estate that is in the possession of third parties, by requiring turnover of the property to the trustee. The failure of an entity in possession of estate property to turn over the property to the trustee would be a violation of section 362(a)(3) except as may otherwise be provided in section 542.

3 *Collier on Bankruptcy* § 362.03[5] at page 362–20 (15th ed. Rev.1999). *Accord, In re Colortran, Inc.,* 210 B.R. 823 (9th Cir. BAP 1997), *aff'd* as to holding of violation of automatic stay, 165 F.3d 35, 1998

WL 792307 (9th Cir.1998), *citing In re Goodman,* 991 F.2d 613 (9th Cir.1993).

> A creditor who fails to return the estate's property after it knows of the debtor's bankruptcy is subject to sanction for willful violation of the automatic stay.

*In re Colortran, Inc., supra,* 210 B.R. at 827.

■ The Court concludes that affirmative application of a partial refund of a post-petition premium received from Mountaineer to a post-petition claim against Wolverine constituted an "act ... to exercise control over property" of Mountaineer's estate and therefore constituted a violation of the automatic stay. As counsel for Mountaineer points out, a creditor need not knowingly and intentionally intend to violate the automatic stay in order for it to transgress the "willful violation" provisions of 11 U.S.C. § 362(h). It is only necessary that the creditor commit an intentional act with knowledge of the existence of the automatic stay, not necessarily knowing the stay's applicability to the act in question. *Hanna Coal Co. v. Internal Revenue Service,* 218 B.R. 825, 829 (W.D.Va.1997). Furthermore, as pertinent to the facts of this case, the Court of Appeals for the Fourth Circuit has held that the remedy provided by § 362(h) is equally available to corporate as well as personal individual debtors. *Budget Service Company v. Better Homes of Virginia,* 804 F.2d 289 (4th Cir.1986).

    B.   Liberty Mutual's Tardy Refund of Insurance Premium Overpayment.

■ A much more difficult issue is presented as to whether Liberty Mutual's tardy and under-the-pressure-of-litigation premium refunds can be deemed a violation of the automatic stay. The question is whether the simple failure to make a partial refund due the debtor in a timely manner constitutes an "exercise [of] control over" property of the debtor's estate within the meaning of the automatic stay provisions of 11 U.S.C. § 362(a)(3). A

strict reading of the statute would suggest a negative answer because the language prohibiting exercise of control over "property of the estate" appearing in § 362(a)(3) seems much more akin to the language of § 542(a) requiring a party "in possession, custody or control ... of property that the trustee may use, sell or lease" to deliver the same to the trustee, than it does to the language of § 542(b) which requires "an entity that owes a debt that is property of the estate" to pay it over to the benefit of the estate. Accordingly, a good case can be made that Congress failed, either intentionally or inadvertently, to include the act of failing or refusing to pay over to the trustee or debtor-in-possession money owed on a contract claim in favor of the debtor as being a violation of the automatic stay. Moreover, language from a fairly recent opinion of the Supreme Court lends support to such a conclusion. The case in question, *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995), held that a bank's administrative freeze of a debtor's checking account preparatory to filing a motion for relief to exercise its right of offset was not a violation of the automatic stay by exercising control over the estate's property.

> Respondent's reliance on these provisions [§ 362(a)(3) and (a)(6) ] rests in the false premise that petitioner's administrative hold took something from the respondent, or exercised dominion over property that belonged to respondent. That view of things might be arguable if a bank account consisted of money belonging to the depositor and held by the bank. In fact, however, it consists of nothing more than a promise to pay, from the bank to the depositor, *Bank of Marin v. England*, 385 U.S. 99, 101, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966); *Keller v. Frederickstown Sav. Institution*, 193 Md. 292, 66 A.2d 924, 925 (1949); and petitioner's temporary refusal to pay was neither a taking of possession of respondent's property nor an exercising

of control over it, but merely a refusal to perform its promise.

516 U.S. at 21, 116 S.Ct. 286.

Certainly a narrow reading of the automatic stay language of the Code would avoid some problems of application. For example, what if the entity which owes a mature, liquidated and non-contingent debt to the estate is in financial distress itself and unable to pay such debt? Could its failure to do so be held to be a violation of the automatic stay, or would its inability to pay be deemed a non-willful act? It also would tend to reduce the encouragement given a trustee or debtor-in-possession to hold over the head of its adversary a demand to pay an alleged mature, certain and fixed debt owing to the estate or face the prospect of a claim of automatic stay violation, subjecting it to possible liability for compensatory and even punitive damages as well as attorneys' fees. The Court of Appeals for the District of Columbia Circuit found this type of situation very troubling in the context of a case involving a claim that a party had exercised control over the property of the estate by continuing to use computer software which allegedly constituted intangible property of the estate. It held that a party acting "in accord with his view of the dispute rather than that of the debtor-in-possession or bankruptcy trustee" is not to be found to have exercised control over the property of the estate so as to subject it to a claim of automatic stay violation. *United States v. Inslaw, Inc., supra*, 932 F.2d at 1472.

On the other hand, such an interpretation of the statutory language would remove much of the incentive to the entity owing money to the estate to go ahead and pay it over promptly, money which might be critical to the success of the reorganization being attempted. If such entity had to fear only the penalty provided by the contract or generally by law for failure to pay the contract consideration when due, which probably most often would mean simply interest and normally taxable court costs assessable upon a judgment for a

debt, the payover obligation of § 542(b) would be deprived of much practical force. In other words, it would not seem to give the trustee or debtor-in-possession much, if anything, beyond the contract claim which exists independent of the language of § 542(b), at least in the situation where the obligor to the estate was not also the holder of a pre-petition claim against the estate. Such an obligor would face the potential sanction of having its claim against the estate disallowed as a result of its failure to satisfy its payover obligation. A more expansive interpretation of the "exercise control over" language of 11 U.S.C. § 363(a)(3) would certainly give more force to the turnover and payover obligations imposed by § 542.

In weighing these competing considerations, the Court has considered that the Court of Appeals for the Fourth Circuit has demonstrated a willingness to go beyond the strict literal wording of 11 U.S.C. § 362 when necessary to give practical effect to the remedy provided for violations of the automatic stay. *Budget Service Co. v. Better Homes of Virginia*, 804 F.2d 289, 292 (4th Cir.1986)(the remedy provided by § 362(h) to an "individual" damaged by a creditor's violation of the automatic stay interpreted to include debtors which are legal entities). The Court further acknowledges that the policy arguments in favor of finding a violation of the automatic stay when a creditor, without a reasonable basis therefor, refuses to pay over a debt owed to the bankruptcy estate are weighty. Nevertheless, the Court concludes that Congress intended to bring within the net of automatic stay violations affirmative acts designed to obtain or maintain control of the debtor's property during the pendency of the case. *See In re Young*, 193 B.R. 620 (Bankr.D.Dist.Col. 1996). If Congress had intended to make a failure to honor one's turnover or payover obligation under § 542 a violation of the automatic stay, it could have done so easily and clearly. The Court does not believe that Congress intended to convert a matter of contract dispute into a violation of the automatic stay. The sanctions provided for violation of the automatic stay, being both remedial and punitive in nature, suggest that the Court should be careful in construing the parameters of the automatic stay provided by § 362(a) so that creditors or others are not punished for passive conduct, even when wrongful and without a reasonable basis therefor, which is not clearly proscribed by the statute.

In conclusion, the Court finds that a party does not violate the automatic stay when its conduct is limited to its failure, even without good cause, to pay over to the debtor-in-possession or trustee a debt which it owes to the bankruptcy estate. Whether this analysis is equally applicable to a creditor's refusal to relinquish possession of a debtor's tangible personal property, such as a creditor's lawful pre-petition repossession of a debtor's vehicle which it continues to retain post-petition, is not before the Court and should await a case properly presenting it for decision.

## VIII. Damages

Mountaineer makes no contention that the delay in paying over money to which it was entitled caused any damages to it other than simply the loss of the use of the money and the cost of the legal proceedings which were brought to compel its payment. The Court has determined that the application of a Mountaineer refund to cover the $27,430 postpetition claim against Wolverine was a violation of the automatic stay. Accordingly, the debtor has been damaged in that amount plus interest thereon and its attorney's fees, which have been indicated to be on the order of approximately $20,000. The Court has also concluded, however, that based on the evidence before it, the debtor has received during the pendency of this case an excess refund from Liberty Mutual for the last policy year (9/1/96–5/29/97) in the amount of $76,590. The Court further concludes that punitive damages for the offset of the Wolverine claim are not appropriate because Liberty Mutual's treat-

ment of the two companies as simply one account was consistent with the pre-bankruptcy dealings between the parties. In other words, it acted in accordance with what it believed its rights to be in the matter. While its belief was incorrect, thereby subjecting it to compensatory damages and attorney's fees, it was not of a nature to justify imposition of punitive damages. While its subsequent wrongful and unjustified failure to refund moneys due the debtor after the termination of the insurance coverage is of a different nature, the Court has determined for the reasons previously noted that it does not believe that such conduct violated the automatic stay. Even adding interest for the delayed period in making the refunds due would still make the aggregate total of all of these items less than Liberty Mutual's excess refund to Mountaineer for the final policy year.

IX. *Admission of Exhibit # 85 (Premium Calculation for 9/1/96–5/29/97 Policy Year) and Motion to Amend Pleadings*

Exhibit # 85 was the document prepared by Mr. Perola Andersson the night before trial and containing his calculation of the proper premium for the final short policy year of 9/1/96–5/21/97. Counsel for the plaintiff objected to the admission of the exhibit and the Court took this objection under advisement. Subject to this objection, Mountaineer's bookkeeper, Mrs. Funk, reviewed this computation and testified concerning it. The admission of this exhibit has possible relevance in two contexts: (1) whether Mountaineer was as of the time of trial entitled to recover any additional sum from Liberty Mutual, and (2) whether Liberty Mutual has actually over-refunded to Mountaineer and was entitled to any recovery from it. Liberty Mutual's Affirmative Defense and Counterclaim contained in its Answer, in the original and amended versions of same, asserted a right to offset any post-petition deficiency against any post-petition overpayment, and stated that it would refund any excess overpayment to its insured. It

did not allege that it had any claim against Mountaineer for any excess refund made. This omission is understandable in that the company's representatives and counsel were not aware until immediately preceding the trial that an overpayment had apparently occurred. Still, Mountaineer was not prepared to face a claim that it owed money to Liberty Mutual rather than vice-versa and objected to this exhibit and the testimony supporting it.

Rule 7015 of the Federal Rules of Bankruptcy Procedure incorporates Rule 15 of the Federal Rules of Civil Procedure into the trial of adversary proceedings. That Rule in part provides as follows:

(b) Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleadings.

At the conclusion of all the evidence, counsel for Liberty Mutual moved that it be allowed to amend its pleadings to allege an affirmative right of recovery as a counterclaim against Mountaineer. The Court took this Motion, which was opposed by Mountaineer, under advisement.

Because the Court doesn't believe that Mountaineer was in fact prejudiced by the admission of Exhibit # 83 for establishing the correct policy premium for the final period of coverage, and affirmatively believes that the ends of justice would be served, it admits such exhibit into evidence for such purpose. Because the Court also believes that Mountaineer would likely be prejudiced by admission of the exhibit over its objection for the purpose of establishing a right of recovery against it and because Liberty Mutual wrongfully withheld refunds due the bankruptcy estate without being able to provide at trial a reasonable justification for such delays, the Court will refuse to grant Liberty Mutual's Motion to Amend its pleadings to plead an affirmative right of recovery.

*X. Equitable Subordination of Liberty Mutual's Claim and Final Conclusion*

In its Second Amended Complaint which the Court allowed Mountaineer to file after the case had been set for trial, Mountaineer alleged "that the acts of the defendant in withholding and retaining property of the estate are sufficient to equitably subordinate the claim of Liberty Mutual for purposes of distribution to all other unsecured creditors in this cause." The statutory basis for such an action would be 11 U.S.C. § 510(c). Neither of the parties before the Court emerges from this litigation looking very admirable. Mountaineer obtained insurance coverage originally from Liberty Mutual by means, in the most favorable light, of non-disclosure of those circumstances which would have precluded its ability to obtain coverage if full disclosure had been made. For its part, Liberty Mutual handled its business dealings with Mountaineer very sloppily, at best. In the absence of any better explanation at trial, a reasonable inference is that Liberty Mutual failed to make the refund due Mountaineer after the termination of the policy on May 29, 1997 and Mr. Courtney's audit on or about July 15, 1997 as previously described in this opinion simply to keep the money unless and until compelled to do otherwise. It failed to do otherwise until more than a year later when its employees were faced with the necessity of testifying in depositions and this proceeding was far advanced. Another reasonable inference, or perhaps a somewhat different way of characterizing the same inference, is that Liberty Mutual was then facing a variety of claims in this adversary proceeding when the final audit was conducted, not all of which claims were justified, and it may have determined initially to leave the final resolution of the parties' differences to this Court's decision. In either event, while the Court doesn't believe that such conduct justifies disallowance or subordination of its pre-petition claim against the estate, it does believe that such actions together with the procedural posture of this case at trial do justify the Court's refusal to allow it to amend its counterclaim, thereby in effect subordinating its overpayment claim against the estate to the payment of all other claims against such estate. In short, the Court concludes that the best justice between these parties is simply to leave them as the Court found them. Liberty Mutual has wounded itself adequately to serve as appropriate punishment for its post-petition handling of this account. The Court will not add more to it. Neither shall recover from the other. A judgment order dismissing this proceeding will be entered. Each party shall bear its own costs.